UNITED STATES of America,
Plaintiff,

v.

COASTAL UTILITIES,
INC., Defendant.

No. CV404–90.

United States District Court,
S.D. Georgia,
Savannah Division.

March 28, 2007.

James L. Coursey, Jr., U.S. Attorney's Office, Savannah, GA, Michael N. Wilcove, U.S. Dept. of Justice, Washington, DC, for Plaintiff.

Inman Gregory Hodges, Timothy D. Roberts, Oliver, Maner & Gray, LLP, Savannah, GA, Patrick Connors DiCarlo, Philip C. Cook, Matthew Sperry, Alston & Bird, LLP, Atlanta, GA, for Defendant.

## *ORDER*

MOORE, Chief Judge.

Before the Court are Defendant Coastal Utilities, Inc.'s and Plaintiff United States of America's cross motions for summary judgment. (Docs. 30 & 36, respectively.) After careful consideration and for the following reasons, Defendant's motion is **DENIED** and Plaintiff's motion is **GRANTED.** Plaintiff's Motion to Strike (Doc. 52) is **DENIED AS MOOT.**

## I. BACKGROUND

### A. *Summary of Claims*

On June 2, 2004, the United States of America ("the Government") filed the instant suit against Defendant Coastal Utilities, Inc. ("Coastal") to recover funds which it contends were erroneously refunded to Coastal after Coastal filed an amended income tax return for the 1998 calendar year. Specifically, the Government maintains that Coastal incorrectly excluded from income certain "universal service support" payments it received from the federal government and the State of Georgia.

The issue is whether the universal service support payments are includable in gross income or whether they constitute a nonshareholder contribution to capital, which is excludable from income under § 118 of the Internal Revenue Code. Coastal contends that these payments constitute a contribution to capital, and were therefore correctly excluded from income. The Government disagrees.

Additionally, the parties have filed extensive stipulations of fact, which the Court specifically adopts in this Order. However, so that it may fully assess the claims of the parties, the Court will now lay out many of these facts in the sections that follow, paying special attention to the creation of the universal service support plans and the mechanisms by which the amount of support is determined.

### B. *The Advent of Universal Service*

In the early twentieth century, the president of the Bell System, Theodore Vail, introduced a new and popular slogan: "One Policy, One System, Universal Service." The concept of universal service was based on Vail's belief that everyone should have access to a telephone for outgoing calls and that a single telephone company was necessary to meet that goal. Years later, the federal government embraced Vail's idea, in part, and incorporated his vision of universal service into the Federal Communications Act of 1934.[1] As Section 1 of the 1934 Act stated, the Federal Communications Commission ("the FCC") was created:

> for the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States, ... a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges
>
> . . . .

*Texas Office of Pub. Util. Counsel v. Fed. Commc'ns Comm'n.,* 183 F.3d 393, 405–406 (5th Cir.1999)(quoting 47 U.S.C. § 151).

Sixty-two years later, the 104th Congress of the United States approved the Telecommunications Act of 1996 ("the 1996 Act"). This Act, like its predecessor, championed the idea of universal service, stating, "Consumers in all regions of the Nation, including low-income consumers and those in rural, insular, and high cost areas, should have access to telecommunications and information services ... at rates that are reasonably comparable to rates charged for similar services in urban areas." 1996 Act § 254(b)(3), 47 U.S.C. § 254(b)(3)(originally enacted June 19, 1934, c. 652, Title II, § 254, as added Feb. 8, 1996, Pub.L. 104–104, Title I, § 101(a), 110 Stat. 71; and amended Sept. 30, 1996, Pub.L. 104–208, Div. A, Title I, § 101(e) [Title VII, § 709(a)(8)], 110 Stat. 3009–313). However, "[b]ecause opening local telephone markets to competition is a prin-

---

1. *See* Jamie N.Nafzinger, *Time to Pay up: Internet Service Providers' Universal Service Obligations Under the Telecommunications Act of* *1996,* 16 J. Marshall J. Computer & Info. L. 37, 40–41 (1997).

cipal objective of the [1996] Act, Congress recognized that the [then existing] universal service system of implicit subsidies would have to be reexamined." *Texas Office*, 183 F.3d at 406.

"To attain the goal of local competition while preserving universal service, Congress directed the FCC to replace the patchwork of explicit and implicit subsidies with 'specific, predictable, and sufficient Federal and State mechanisms to preserve and advance universal service.'" *Id.* (quoting 1996 Act § 254(b)(5), 47 U.S.C. § 254(b)(5)). The FCC was given the authority to take the appropriate regulatory action to define the system envisioned by Congress and to establish a timetable for implementation of the 1996 Act. Additionally, Congress provided for the creation of a Federal–State Joint Board on Universal Service (the "Joint Board") to coordinate federal and state regulatory interests. 1996 Act § 254(a), 47 U.S.C. §§ 254(a), 410(c). The Joint Board drafted non-binding recommendations pertaining to universal service.

Congress did not legislate which services must be universally offered, nor did it dictate any specific methods to support universal service. That responsibility was delegated to the FCC. *See Alenco Commc'ns. v. Fed. Commc'ns. Comm'n*, 201 F.3d 608, 615 (5th Cir.2000).[2] But Congress did not leave the FCC and the Joint Board without direction. Rather, it set forth six principles upon which the FCC was to base its policies for the preservation and enhancement of universal support.[3] 1996 Act § 254(b), 47 U.S.C. § 254(b). Finally, Congress authorized the FCC to develop any additional principles that the FCC deemed appropriate.[4] *Id.*

On May 8, 1997, the FCC issued its order establishing which services must be universally available and how they will be supported ("Universal Service Order"). *In the MATTER OF FED.-STATE JOINT BD. ON UNIVERSAL SERV.*, 12 F.C.C.R. 8776, 1997 WL 236383 (1997). The types of services that must be available and are thus eligible to be supported by universal service programs include "single party-service; voice grade access to the public switch network; Dual Tone Multifrequency ('DTMF'); signaling or its

**2.** Although the FCC is required to obey statutory commands, the guiding principles reflect congressional intent to delegate difficult policy choices to the Commission's discretion. *Alenco*, 201 F.3d at 615.

**3.** Of the six principles, five are germane to Coastal and are as follows:

(1) quality services should be available at just, reasonable and affordable rates;
(2) access to advanced telecommunications and information services should be provided in all regions of the nation;
(3) consumers in all regions of the nation, including low-income consumers and those in rural, insular and high cost areas, should have access to telecommunications and information services, including interexchange services and advanced telecommunications and information services, that are reasonably comparable to those services provided in urban areas and that are available at

rates that are reasonably comparable to those services provided in urban areas and that are available at rates that are reasonably comparable to rates charged for similar services in urban areas;
(4) all providers of telecommunication services should make an equitable and nondiscriminatory contribution to the preservation and advancement of universal service; and
(5) there should be specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service.
47 U.S.C. § 254(b).

**4.** Pursuant to the authority granted by Congress, the FCC set forth competitive neutrality as an additional principle behind universal service. *In the MATTER OF FED.-STATE JOINT BD. ON UNIVERSAL SERV.*, 12 F.C.C.R. 8776, 1997 WL 236383, ¶ 21 (1997).

functional equivalent; access to emergency services . . . .; access to operator services; access to interexchange service; access to directory assistance; and toll limitation services for qualifying low-income consumers." *Id.* ¶ 22. Carriers who provide these services are eligible to receive federal universal service support. *Id.* ¶ 56; 1996 Act §§ 214(e), 254(e), 47 U.S.C. §§ 214(e), 254(e). A carrier who receives this support may only use it "for the provision, maintenance, and upgrading of facilities and services for which the support is intended." 1996 Act § 254(e), 47 U.S.C. § 254(e).

The FCC adopted four programs to implement the directives of the 1996 Act: Low Income, Schools and Libraries, Rural Health Care, and High Cost. *Id.* at ¶ 18. This case involves the tax character of payments received by Coastal under the High Cost Program.

### C. *Coastal's Network*

Coastal is a "local" telephone company that serves residential and business customers ("subscribers") in and around Liberty County, Georgia. By subscribing to Coastal's telephone service, these subscribers are able to place and receive "local calls" and "long distance calls." With exceptions not relevant here, a local call is one that begins and ends within the region that Coastal serves. A long distance call is one that begins or ends outside of Coastal's service area.

Coastal's network consists of loops, switches, and trunks. A "loop" is the circuit that connects a subscriber to Coastal's central switching office.[5] In the past, each loop generally consisted of a twisted pair of cooper wires that extended from the subscriber's premises to the telephone company's central office switch. By 1998, however, loops in Coastal's network often utilized both fiber optic cables and copper wires. In 1998, Coastal's service area had approximately 38,000 loops.

A "switch" is the piece of equipment that routes each call to the proper recipient based on the digits dialed by the initiator of the call. If the call is a local call, the switch directs the call to the loop that connects to the recipient's premises. If the call is long distance, the switch directs the call to a trunk. A "trunk" is the facility that connects Coastal's network with the networks of other providers, such as long distance companies.

A significant portion of the cost of a local telephone network is the provision of loop facilities. For example, in 1998 over 60% of Coastal's capital investment was represented by loop facilities. The cost per subscriber of loop facilities in rural areas is generally higher than the cost in more densely populated areas. The reason for the price differential is three-fold. First, rural telephone companies often serve subscribers who live far apart from one another. Thus, the companies cannot take advantage of the scale economies that carriers enjoy by installing loop facilities in more densely populated urban and suburban areas. Second, longer loop lengths are necessary in rural areas, because subscribers may be located quite far from the central switching office. Finally, challenges of rural topography may add to the cost of loop facilities.

---

5. Coastal maintains its central switching office in Hinesville, Georgia. Its network also includes remote switching offices and remote concentrators. The three remote switching offices are located in Midway, Richmond Hill, and Bryan Village on Fort Stewart, Georgia. These remote offices serve subscribers whose premises are located in proximity to the remote switching offices. These offices are connected to the central switching office by a link, and are capable of routing local calls between subscribers in the area served without sending the calls to the central switching office.

Rural telephone companies also face a higher cost per subscriber to install switches in sparsely populated areas. Each switch consists in large part of a sophisticated computer and software system, the fixed cost of which is spread over the number of access lines connected to it. In rural areas, there are fewer subscribers, which results in a higher switching cost per subscriber. Additionally, the cost of trunk lines that connect rural telephone companies with interexchange carriers and other network service providers tends to be higher because the trunk lines often must travel a longer distance.[6]

### D. *The High Cost Program Generally*

Although the above explanation of Coastal's network is simplistic, it is easy to see why it would be difficult for telephone companies to provide services in rural areas for rates comparable to the rates charged in cities. The consequence for residents in rural areas would be either no telephone service or service only at very high rates. In response to these concerns, the Joint Board recommended the creation of the High Cost Program. The stated purpose of this program is in keeping with the general purpose expressed by Congress in creating universal service support. More specifically, the Joint Board wrote that the aim of the High Cost Program is to benefit the public by providing ubiquitous and affordable access to basic and advanced telecommunications services throughout the United States. *See* Rural Task Force Recommendation to the Federal–State Joint Board on Universal Service at 18, CC Docket No. 96–45 (Sept. 29, 2000)("the RTF Recommendations"). To accomplish this goal, the High Cost Program provides qualifying local exchange

carriers with funds to extend the telecommunications infrastructure into rural and other high-cost areas where such investment would not otherwise be economically viable.[7] *Universal Service Order,* ¶¶ 1, 8.

The High Cost Program is administered by the Universal Service Administration Company (USAC), which was appointed by the FCC. USAC's functions and responsibilities include administering each of the universal service mechanisms, collecting distributions, disbursing universal service funds, and making periodic reports to the FCC. The High Cost Program is funded by payments made by every telecommunications carrier based on the interstate and international end user billed revenues of each company.

Since the implementation of the 1996 Act, the High Cost Program has included a variety of funding mechanisms, three of which are at issue in the instant case: (1) High Cost Loop Support, (2) Local Switching Support, and (3) Long Term Support. During 1998, Coastal received payments under these three mechanisms. The High Cost Loop Support mechanism provides funding to rural telephone companies whose average cost per loop is greater than 115% of the nationwide average. The Local Switching Support mechanism provides funds to those companies that serve study areas with 50,000 or fewer loops. These funds support costs incurred in switching calls between loops, if the call is local, or between a trunk and a loop if the call is long distance. The Long Term Support mechanism allows a carrier to recover a portion of loop costs that have been allocated to the provision of interstate services.

---

6. In 1998, Coastal also offered its own long distance service through a subsidiary corporation. That service is not involved in this case.

7. In order to receive payments under the High Cost Program, a telecommunications company must be certified as an "Eligible Telecommunications Carrier" by the state of Georgia. In 1998, Coastal was so certified.

The federal government was not alone in its recognition of the benefits of universal service. Coastal also received funding from the Georgia Universal Access Fund, which enabled telephone companies to recover revenues lost as a result of a mandated reduction of intrastate charges. The specifics of all of these support mechanisms are discussed in greater detail below.

## II. DISCUSSION OF LEGAL AUTHORITY

### A. *Sections 61 and 118*

■ Section 61(a) of the Internal Revenue Code provides a broad definition of "gross income": "Except as otherwise provided in this subtitle, gross income means all income from whatever source derived." 26 U.S.C. § 61(a). The Supreme Court has emphasized that the "sweeping scope" of this section reflects Congress's intent to exert the full measure of its taxing power. *Comm'r v. Schleier*, 515 U.S. 323, 327–328, 115 S.Ct. 2159, 132 L.Ed.2d 294 (1995); *Helvering v. Clifford*, 309 U.S. 331, 334, 60 S.Ct. 554, 84 L.Ed. 788 (1940). The corollary to § 61(a)'s broad construction is the "default rule of statutory interpretation that exclusions from income must be narrowly construed." *Schleier*, 515 U.S. at 328, 115 S.Ct. 2159 (quoting *United States v. Burke*, 504 U.S. 229, 248, 112 S.Ct. 1867, 119 L.Ed.2d 34 (1992) (Souter, J., concurring in judgment)).

Section 118(a) excludes from gross income "any contribution to the capital of the taxpayer." 26 U.S.C. § 118(a). Treasury Regulation 1.118–1 provides that a contribution to capital can be either money or property and that this can apply to contributions made by both shareholders and nonshareholders. 26 C.F.R. § 1.118–1. With regard to nonshareholder contributions to capital, § 1.118–1 offers contrasting examples:

> For example, the exclusion applies to the value of land or other property contributed to a corporation by a governmental unit or by a civic group for the purpose of inducing the corporation to locate its business in a particular community, or for the purpose of enabling the corporation to expand its operating facilities. However, the exclusion does not apply to any money or property transferred to the corporation in consideration for goods or services rendered, or to subsidies paid for the purpose of inducing the taxpayer to limit production.

26 C.F.R. § 1.118–1.[8]

The statutory phrase "contribution to capital" is not expressly defined by statute. Instead, the legislative history of § 118 explicitly states that the statute was meant to "place[ ] in the Code the Court decisions on this subject." H.R.Rep. No. 83–1337, at A–38 (1954) reprinted in 1954 U.S.C.C.A.N. 4017, 4042; S.Rep. No. 83–1622 (1954), reprinted in 1954 U.S.C.C.A.N. 4621. At the time of the law's enactment, the Supreme Court had issued opinions in several significant cases regarding exclusions for nonshareholder contributions to capital. These cases, essentially, laid the ground work for the enactment of § 118.[9]

### B. *Early Supreme Court Decisions and the Contributor Motivation Test*

The genesis of the capital contribution doctrine was *Edwards v. Cuba Railroad*

---

8. The examples given in § 1.118–1 are derived from a series of Supreme Court cases, discussed in Part II(B) & (C).

9. Some courts have indicated that Congress enacted § 118 to codify the preexisting concept of a capital contribution. *Bd. of Trade v. Comm'r*, 106 T.C. 369, 378, 1996 WL 280898 (1996).

*Co.*, 268 U.S. 628, 45 S.Ct. 614, 69 L.Ed. 1124 (1925), in which the Supreme Court held that subsidy payments by the Cuban government for the construction and operation of a railroad did not constitute taxable income. The Court noted that the subsidy payments "were proportionate to mileage completed" and "necessary to construct the railroad." *Id.* at 632, 45 S.Ct. 614. This indicated a "purpose to reimburse [the taxpayer] for capital expenditures." *Id.* Furthermore, the payments were transferred to capital accounts rather than surplus; they were "not made for services rendered or to be rendered;" and they were "not profits or gains from the use or operation of the railroad." *Id.* at 633, 45 S.Ct. 614. For these reasons, the Court held that the payments did not constitute income. The *Cuba Railroad* decision established an objective, functional use test, which required an examination of the subsidy's function in order to determine if it was a reimbursement to the corporation for capital expenditures. This approach was followed, though narrowed somewhat, in a series of cases over the next decade.[10]

In *Texas Pacific Railway Co. v. United States*, 286 U.S. 285, 52 S.Ct. 528, 76 L.Ed. 1108 (1932), the Court held that government payments to a railroad to guarantee a minimum operating income were not contributions to capital. The payments were made to the railroads to assist their transition out of federal control after World War I. If a railroad's revenue fell below a fixed level, then the government agreed to make up the "deficiency." But if the income exceeded the minimum, then the carrier was obligated to pay the excess back to the government. *Id.* at 289, 52 S.Ct. 528. The Court held that the "purpose of the guaranty provision was to stabilize the credit position of the roads by assuring them a minimum operating income." *Id.* Distinguishing *Cuba Railroad*, the Court noted that the monies were not conditioned on "construction work performed," but instead could be used "for the payment of dividends, of operating expenses, of capital charges, or for any other purpose within corporate authority." *Id.* For all of these reasons, the payments were not a contribution to capital.

But the Court soon moved away from the functional use test articulated by *Cuba Railroad*, developing a subjective, contributor motivation test in *Detroit Edison Co. v. Commissioner*, 319 U.S. 98, 63 S.Ct. 902, 87 L.Ed. 1286 (1943) and *Brown Shoe Co. v. Commissioner*, 339 U.S. 583, 70 S.Ct. 820, 94 L.Ed. 1081 (1950). This test focuses on the intent of the contributor rather than the function of the payments. In *Detroit Edison*, the Court held that payments made by prospective customers of an electric company to cover the cost of extending the utility's facilities to the customers' homes were part of the price of services and not contributions to capital. 319 U.S. at 103, 63 S.Ct. 902. Because the transferors made the payments with the intention of receiving a direct benefit in the form of specific services, the payments could not be considered a contribution to capital. The Court concluded, "[I]t overtaxes the imagination to regard farmers and other customers who furnished these funds as makers either of donations or contributions to the Company. The transaction neither in form nor substance bore such a semblance." *Id.* at 102, 63 S.Ct. 902.

---

**10.** The rationale of the *Cuba Railroad* decision is "no longer supportable under current definitions of gross income or Supreme Court interpretations of the Sixteenth Amendment." John C. Taylor, *Achieving Capital Contribu-* *tion Treatment For Location Inducements*, 87 J. Tax'n 112 (1997). In addition, the scope of the capital contribution doctrine, now codified at § 118, has also been narrowed by subsequent case law. *Id.; see also infra.*

The Court followed the contributor motivation test again seven years later in *Brown Shoe,* holding that the location inducements at issue were contributions to capital. 339 U.S. at 592, 70 S.Ct. 820. The dispute involved transfers of cash and other property made by civic groups to induce the taxpayer to build and operate facilities in their communities or expand the facilities already there. In holding that the assets transferred were contributions to capital, the Court distinguished *Detroit Edison* on the basis of the contributor's motivating purpose behind the transaction. In *Detroit Edison,* the transferors were customers who paid for the services they received, and the payments were made in exchange for those services. But in *Brown Shoe,* the contributors were community groups who were not paying for any specific goods or services. Instead, they expected only that the transactions would benefit the community at large by providing jobs. Justice Clark, writing for the majority, stated that in *Brown Shoe* there were "neither customers nor payments for service," and that therefore the Court "may infer a different purpose in the transactions between petitioner and the community group." *Id.* at 591, 70 S.Ct. 820.

### C. *The CB & Q Decision, the Contributor Motivation Test, and the Five Factor Inquiry*

■ The seminal case regarding nonshareholder contributions to capital is the Supreme Court's decision in *United States v. Chicago, Burlington & Quincy Railroad Co.,* 412 U.S. 401, 93 S.Ct. 2169, 37 L.Ed.2d 30 (1973) (*"CB & Q "*). The government made payments to the taxpayer railroad to fund improvements to highway crossings, crossing signals, signs, and lighting. The railroad performed the construction work at the public expense, but assumed the responsibility for maintaining the facilities at its own expense. The Court held that the government subsidies were not contributions to capital and could not be depreciated.

First, the Court sought to reconcile its holdings in *Detroit Edison* and *Brown Shoe.* The decisional difference could be found in the contributor's motivation, because "in *Detroit Edison* the transferor intended no contribution to the transferee's capital, whereas in *Brown Shoe* the transferors did have that intent." *Id.* at 412, 93 S.Ct. 2169. The Court elaborated on the contributor motivation test:

> [N]either in *Detroit Edison* nor in *Brown Shoe* did the Court focus upon the use to which the assets transferred were applied, or upon the economic and business consequences for the transferee corporation. Instead, the Court stressed the intent or motive of the transferor and determined the tax character of the transaction by that intent or motive. Thus, the decisional distinction between *Detroit Edison* and *Brown Shoe* rested upon the nature of the benefit to the transferor, rather than to the transferee, and upon whether that benefit was direct or indirect, specific or general, certain or speculative. These factors, of course, are simply indicia of the transferor's intent or motive.

*Id.* at 411, 93 S.Ct. 2169.

■ The Court also stated that "some of the other characteristics of a nonshareholder contribution to capital" could be distilled from *Detroit Edison* and *Brown Shoe. Id.* at 413, 93 S.Ct. 2169. The Court listed five such characteristics:

> [1] It certainly must become a permanent part of the transferee's working capital structure. [2] It may not be compensation, such as a direct payment for a specific, quantifiable service provided for the transferor by the transferee. [3] It must be bargained for. [4] The asset transferred foreseeably must

result in benefit to the transferee in an amount commensurate with its value. And [5] the asset ordinarily, if not always, will be employed in or contribute to the production of additional income and its value assured in that respect. *Id.*

The Court found that the subsidies were not contributions to capital because they did not meet all five criteria. Although the assets transferred were not payments for specific, quantifiable services performed by CB & Q for the government, the other four characteristics showed that the payments did not qualify as contributions to capital. *Id.* at 413–414, 93 S.Ct. 2169. The taxpayer had not "in any real sense" bargained for the facilities, and any incremental economic benefit to CB & Q was "marginal." *Id.* at 414, 93 S.Ct. 2169. The facilities constructed were "peripheral to its business," and "did not materially contribute to the production of further income by the railroad." *Id.* Finally, "no substantial incremental benefit in terms of the production of income was foreseeable or taken into consideration at the time the facilities were transferred." *Id.* at 415, 93 S.Ct. 2169. Accordingly, the Court found that the transaction was not a contribution to capital.

### III. ANALYSIS OF UNIVERSAL SERVICE SUPPORT

In the instant case, the parties agree that the contributor motivation test and the *CB & Q* factors provide the applicable standard for determining whether the universal support payments were income or a contribution to capital. The Government contends that the payments were intended to supplement Coastal's annual operating income, and that this demonstrates that the payments were not intended as a contribution to capital. It argues that the payments are income because the amount of the subsidies was based on a broad range of operating expenses, in addition to

investment, and factored in a "revenue requirement" of 11.25%.

Coastal maintains that under binding Supreme Court precedent, the payments should be considered a contribution to capital because they were designed to accomplish a public purpose and were not in exchange for specific goods and services. Coastal also argues that the payments were designed to be used, and were used, as investment into expanding the telecommunications network; that the use of the funds was restricted to capital outlays; and that the amounts were calculated based on the amount of investment.

Summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing Fed.R.Civ.P. 56 advisory committee notes).

In the instant case, the parties have stipulated to all the relevant facts. There is, therefore, no genuine issue of material fact remaining for trial. Because there is no dispute regarding facts necessary to the resolution of this case, the issues presented are squarely before the Court as a matter of law. For the reasons set forth below, the Court holds that the universal support payments were not a contribution to capital.

### A. *The Calculation of Payments and the Contributor Motivation Test*

The mechanisms used to calculate the amount of universal support show that the

purpose of the payments was to supplement income. Although Coastal is correct that the amounts were largely based on investment expenditures, the calculations also take into consideration operational, maintenance, administrative, and other expenses that are unrelated to capital investment. The broad range of costs and expenses that are tied into the calculation of the universal support payments shows that the subsidies are more properly considered as supplements to general revenue and not as specific capital contributions. Further, the calculations also consider Coastal's revenue and a revenue requirement of 11.25%. The universal support payments are tied to the revenue requirement, which factors in Coastal's expenses, taxes, and return on rate base. Because the universal support payments are based on investment return and expenses, the payments are supplemental income and not a contribution to capital. This is true for all three programs under which Coastal received universal support: High Cost Loop Support, Local Switching Support, and Long Term Support.

### 1. High Cost Loop Support

 The purpose of the High Cost Loop Support payments can be determined by examining the mechanisms by which the amounts were calculated.[11] To apply for the support, Coastal submitted a lengthy Data Collection Form to the National Exchange Carrier Association ("NECA").[12] (Doc. 21, Attachment 2.) This form details Coastal's assets, investment, and expenses. The parties' stipulations of fact provide an explanation of each of the entries on the Data Collection Form. The accounts listed on the Data Collection Form match the accounting practices required by the FCC in 47 C.F.R. Part 32. The amounts in the Data Collection form are then plugged into an algorithm that determines Coastal's "average cost per loop." (Doc. 21, Attachment 3.) In 1998, Coastal was eligible to receive High Cost Loop Support based on the average cost per loop. Specifically, Coastal was entitled to receive High Cost Loop Support equal to 65% of its costs that were between 115% and 150% of the national average cost per loop. The total support amounted to $1,814,115.

An examination of these calculations shows that many of Coastal's operating expenses are factored into the average cost per loop. For example, employee wages and benefits are accounted for in various entries. (*See* Doc. 21, Stipulations F(31)-(37).) Although some of these wage and benefit expenses are for employees performing work on capital projects, other wage and benefit expenses are unrelated to capital projects. For example, Data Line 450, for Network Operations Expense, includes "salaries for employees who monitor the overall network; engineering and planning studies not directly assignable to a particular project; the salaries of employees who receive and route trouble reports from subscribers; expenses incurred in dispatching repair persons, controlling traffic flow, assigning transmissions to trunks, and coordinating safety programs." (Doc. 21, Stipulation F(37).) The cost calculations also include corporate operating expenses, such as director and officer salaries, and general administrative expenses. (Doc. 21, Stipu-

---

11. High Cost Loop Support is computed pursuant to regulations found at 47 C.F.R. §§ 36.601–36.622.

12. The NECA is a non-profit created in 1984 by telecommunications companies to administer the fees that long distance companies pay to access local telephone networks. After the Telecommunications Act of 1996, NECA became indirectly responsible for the Universal Service Fund (USF) programs through its subsidiary corporation the Universal Service Administrative Company ("the USAC").

lation F(38)-(39).) These wage, benefit, maintenance, and administrative costs are added in to the calculation of the total cost per loop. (Doc. 21, Attachment 3, Algorithm Lines 14–26.) The High Cost Loop Support is then based on the average cost per loop.

This mechanism for calculation demonstrates that the High Cost Loop payments are not intended as a contribution to capital. Because the amount of payments takes into consideration a wide range of operational expenses, the payments are not solely for capital purposes. Instead, the payments supplement the shortfall in general revenue that results from charging subscriber rates that fall below the average cost per loop of providing the services.

The calculations for High Cost Loop Support also factor in Coastal's total number of working loops. The payments are not, however, calculated based on a proposal to build new loops or the estimated cost of upgrading existing loops. This shows that the payments are adding to the return on existing services, and not paying for expanding and upgrading infrastructure. Of course, subsidizing the rate of return on existing loops provides Coastal with an incentive to expand services in the future (because increasing the number of loops increases the total return), but the universal support provides this incentive by subsidizing the return on existing loops (income), rather than by specifically paying for the development of new loops (capital).

### 2. Local Switching Support

■ The Local Switching Support mechanism provides payments for costs incurred in switching calls between loops. Coastal received $1,511,151 in Local Switching Support for 1998.

The mechanisms for calculation of the Local Switching Support also indicate that these payments are intended as supplements to income. First, similar to the calculations for High Cost Loop Support, various operating expenses are built into the calculations for Local Switching Support. For example, this includes marketing expenses such as advertising, product sales, developing customer proposals, and the salaries of employees who perform these activities. (Doc. 21, Stipulation G(14).) It also includes customer operations expenses incurred in helping customers place calls, assisting customers if calls are not going through, directory assistance, account maintenance, and customer billing. (Doc. 21, Stipulation G(15).) Because costs such as these are factored into the calculation of Local Switching Support, the payments are properly viewed as supplements to general revenue.

Second, the final amount of Local Switching Support is calculated so as to provide an 11.25% "return on investment." (Doc. 21, Stipulation G(29); Attachment 5 at 3.) The calculation of Local Switching Support factors in investment, income, expenses, taxes, and the revenue requirement to determine the amount of payments. This method of calculation shows that the Local Switching Support payments are intended to provide a return on investment in the form of supplemental revenue, rather than a direct contribution to capital.

### 3. Long Term Support

■ Finally, Coastal received support under the Long Term Support mechanism. This mechanism allows a carrier to recover a portion of the loop costs that have been allocated to the provision of interstate services. The amount of Long Term Support is tied to Coastal's "common line charge" and its "end user common line charge." The common line charge is the fee that interexchange carriers pay in return for using Coastal's network to transmit interstate calls placed or received by Coastal's

subscribers. The end user common line charge is a flat monthly charge that Coastal bills its subscribers. This charge allows Coastal to recover a portion of the interstate costs incurred in providing subscribers with access to interexchange carriers.

Coastal participated in the NECA Common Line Program. This program allows participating carriers to pool certain classes of revenue. The participants in the pool must all charge the same "end user common line" charges and "carrier common line" charges.[13] Pool members pay all of their carrier common line and end user common line revenues to the NECA. The NECA then makes distributions to each carrier equal to their costs of providing access services plus the pool's rate of return.[14] Pooling is designed to even out fluctuations in a participant's revenue and expenses from year to year. It also serves to shift a portion of costs from those participants who incur higher costs to those participants who incur lower costs. Additionally, pooling allows participating local exchange carriers to charge interexchange carriers a consistent rate for connecting long distance calls to local subscribers.

The charges, however, are not set high enough to recover all of the costs. Instead, the charges are set so that the rural carrier's charges would equal the average charge of the large price cap carriers. Hence, the pool may fall short of meeting its revenue requirement. Long Term Support bridges the gap between the revenue and the revenue requirement. In 1998,

Coastal received $863,498 in Long Term Support.

Therefore, similar to Local Switching Support, the Long Term Support payments are also based on a "revenue requirement." (Doc. 21, Stipulation H(6).) The amount of Long Term Support was calculated by comparing the "interstate common line revenue requirement" with the projected revenues from "end user common line charges" and "common carrier line charges." (Doc. 21, Stipulation H(6)-(9).) Coastal's revenues from the line charges were then supplemented by the Long Term Support payments to ensure that Coastal's gross revenue in this area met the revenue requirement. Because the Long Term Support payments were determined by comparing projected revenues with the revenue requirement, the Long Term Support payments were intended to supplement income.

## B. Public Purpose and the Goods and Services Clause

It is undisputed that the driving purpose behind the concept of universal service is to benefit the public. Congress sought to ensure that telephone service was available at a reasonable rate for all Americans. This provides a benefit to the community at large by increasing the overall value of the communications network. As Coastal explains, the legislative history of the 1996 Act consistently refers to the public as the intended beneficiary of universal service. (Doc. 31 at 32–33.) The FCC has also

---

**13.** The NECA, in accordance with FCC regulations, determines the rates participants will charge for a particular year. This is based upon cost data that each participant submits. After it receives the cost data, the NECA develops forecasts that would produce overall pool earnings at the 11.25% rate of return. The NECA files a tariff with the FCC that proposes the end user and carrier common line rates that will be charged by every pool member. The FCC then accepts or suspends the tariff.

**14.** This process is accomplished through set-offs between the amount that the carrier must submit to the NECA and the amount that the participant is entitled to receive from the pool. Either the NECA pays the difference to the participant or vice versa.

recognized that society is the ultimate beneficiary of the High Cost program:

Universal service support mechanisms that are designed to increase subscribership by keeping rates affordable will benefit everyone in the country, including those who can afford basic telephone service. At the simplest level, increasing the number of people connected to the telecommunications network makes the network more valuable to all users by increasing its usefulness to them. Increasing subscribership also benefits society in ways unrelated to the value of the network per se. For example, all of us benefit from widespread availability of basic public services, such as 911.

Universal Service Order ¶ 8.

■ Coastal argues that under the Supreme Court's decisions in *Detroit Edison* and *Brown Shoe,* the payments were a contribution to capital because they were made for a broad public purpose and not in exchange for specific goods and services. In *Detroit Edison,* the Court held that payments by prospective customers to an electric utility to cover the cost of extending the utility's facilities to the customers' homes was part of the price of service and not a contribution to capital. *Detroit Edison,* 319 U.S. at 102–103, 63 S.Ct. 902. In contrast, in *Brown Shoe,* the Court held that payments by a community group to induce a factory to locate in the community were a contribution to capital because the payments were made for benefit of the community at large rather than in exchange for a direct benefit. *Brown Shoe,* 339 U.S. at 591, 70 S.Ct. 820. Coastal reads *Detroit Edison* and *Brown Shoe* as making a bright line distinction between "for a public purpose" and "in exchange for specific goods and services." Coastal then argues that the universal service payments were a contribution to capital be-

cause they were "for a public purpose" and not "in exchange for specific goods and services."

But this argument misreads the distinction made by the case law. On the one hand, if a payment is made in exchange for specific goods and services, then that payment is income and not a contribution to capital. This is the holding in *Detroit Edison,* which is reflected in Treasury Regulation § 1.118–1.[15] But it does not follow that a government payment is a contribution to capital every time a public purpose is in some way implicated. Indeed, this is one of the key insights of *CB & Q,* where the Supreme Court held that even though the payments were not compensation for services, and were for a more general public benefit, they should be considered as income because of other factors. *CB & Q,* 412 U.S. at 414, 93 S.Ct. 2169 (purpose was "for the benefit of the public to improve safety and expedite highway traffic flow," but payments were not a contribution to capital). As the Supreme Court stated, "Although the assets were not payments for specific, quantifiable services performed by CB & Q for the Government as a customer, other characteristics of the transaction lead us to the conclusion that, despite this, the assets did not qualify as contributions to capital." *CB & Q,* 412 U.S. at 413–414, 93 S.Ct. 2169.

Therefore, the broad public purpose of the universal service payments is too generalized to instruct the Court as to the applicability of § 118. At the highest level of generality, all government spending should, theoretically, and at least indirectly, be for the purpose of benefiting the community. To decide a case such as this based on the most generalized expressed purpose of Congress would make virtually

---

**15.** "[The § 118] exclusion does not apply to any money or property transferred to the corporation in consideration for goods or services rendered...." 26 C.F.R. § 1.118–1.

all government subsidies contributions to capital, except where the government received specific goods and services in return for the payments.

For this reason, the parties' relative positions regarding the identity of the transferor are not mutually exclusive. Coastal contends that the controlling motivation is Congress's public purpose for establishing the universal service incentives. The Government maintains that the FCC's more particularized purpose in determining the actual payments should control. Congress's motivation in promulgating 47 U.S.C. § 254 was, undeniably, to preserve and advance universal service in the United States for the public good. *See* 1996 Act § 254(b), 47 U.S.C. § 254(b). The FCC's role is to carry out those objectives. But in the context of § 118, the transferor's motivation cannot be determined by viewing the purpose only at the highest level of generality. As *CB & Q* indicates, other characteristics of the transaction often determine whether a payment should be viewed as a contribution to capital.

This principle instructs the holding in the instant case: that the universal support payments were income even though the general purpose was to benefit the public. Although the Government did not receive any direct benefit in return for the universal service funds paid to Coastal, the payments were income because of other factors, namely, that the calculation of the payments factored in a revenue requirement and operating expenses apart from investment. These mechanisms for calculation demonstrate that the contributor's motivation in making the payments was to supplement income.

C. *The Relationship between Universal Support and Investment*

■ The parties dispute the permissible uses of the universal service funds. By statute, the High Cost Program Funds may be used "only for the provision, maintenance, and upgrading of facilities and services for which the support is intended." 1996 Act § 254(e), 47 U.S.C. § 254(e). Coastal argues that this statute requires the payments to be used only to "build, maintain, and upgrade its telecommunications network." (Doc. 31 at 34.) But Coastal's interpretation of the statute is narrower than the plain language. Under the plain language, the funds may be used to provide "facilities *and services.*" *Id.* (emphasis added). This will necessarily include capital investment, but the use of the funds is not limited only to such capital investment.

This is not to say that the lack of narrow restrictions on the use of the funds signals that the payments should be regarded as income. As Coastal notes, a payment can be a contribution to capital even where the use of the funds is not restricted at all. *See e.g., Brown Shoe*, 339 U.S. at 587, 70 S.Ct. 820 (payments were a contribution to capital even though funds could be used for general operating expenses). But it is inaccurate to maintain, as Coastal does, that the payments could only be used to "build, maintain, and upgrade" the network. And any suggestion that the payments are a contribution to capital because of such restrictions must be rejected.

Coastal also argues at length that the calculations are irrelevant to the motive for the payments. It contends that because the amounts were pegged to investment, the payments should be considered a contribution to capital. This argument fails to capture the distinction between a return on investment previously made (income) and the making of a capital investment (capital). Coastal is correct that the universal service payments are keyed to the amount of investment. But Coastal admits that "rather than considering 'anticipated' capital investment, [the pay-

ments] take into account a carrier's actual capital investment." (Doc. 47 at 7.) This is consistent with the Court's holding that the payments were intended to provide a return on investment.

There is more than one strategy that Congress and the FCC could have used to expand the network. The issue here is whether the universal service funds were directly paying for the infrastructure (capital), or whether the funds were providing an incentive to develop the network by offering a rate of return on the *taxpayer's* investment (income). In the instant case, the calculation mechanisms demonstrate which strategy was adopted. The universal service support funds did not pay for the investment. Instead, the taxpayer paid for the investment, and the universal service payments were calculated to increase the rate of return on that investment, thus providing an incentive for further investment by the taxpayer.

Coastal argues that this theory of the case assumes that Coastal would build and improve telephone infrastructure without universal service funding. This is not so. By providing a supplemental return on investment, the universal service funding provided an incentive for Coastal to make capital investment in expanding and upgrading the network. As Coastal itself explains, "[T]he purpose of the Universal Service Payments was to *induce* Coastal to invest in infrastructure and that is what Coastal did." (Doc. 47 at 12 (emphasis added).) Merely because past investments played a role in the computation of the payments does not automatically transform those payments into a capital contribution.

The difference between a return on investment previously made and the making of a capital investment is illustrated by the distinctions between this case and Revenue Ruling 93–16, 1993–1 C.B. 26 (*"Airport Improvement Grants"*).[16] In this ruling, the Internal Revenue Service ("the IRS") considered whether a project grant made by the Federal Aviation Administration (FAA) to a corporate owner of a public-use airport under the Airport Improvement Program was a nonshareholder contribution to capital under § 118(a). The airports applied to the FAA for the grant, which was highly sought after, and the funds were to be used for airport development. The IRS determined that the grant was a nonshareholder contribution to capital because it was made for a public purpose, because the government did not receive a direct benefit in return, and because it met the five factors of *CB & Q.*

The airport grant, however, is different from the universal support because the government was pursuing a different type of strategy to achieve the ultimate public purpose. There are numerous mechanisms by which the government could seek to accomplish a public purpose such as improving airports or telephone networks. One mechanism would be for the government to provide a specific grant to an airport or telephone company for the purpose of constructing and improving specific infrastructure. The company would make a grant application for specific projects for new infrastructure or improvements; the government would consider the project and weigh competing proposals; and finally, the government would issue a grant for a specific amount of money to be used for capital investment. This is the mechanism illustrated by the airport grants, and the IRS held that this type of grant was a

---

**16.** A revenue ruling is an official interpretation by the IRS for the information of and guidance to taxpayers, IRS professionals, and tax professionals. In the instant case, Reve-

nue Ruling 93–16 is cited for its illustrative value only, and the Court does not rely on it for any precedential value.

nonshareholder contribution to capital where the government did not receive a direct benefit in return for the payments.

This is not the mechanism, however, that the government used to promote the goal of universal service. The universal service support does not provide money for the specific purpose of extending the network. Instead of providing the money directly for the investment, the government provides a return on investment made by the local telephone company, taking into consideration actual investment, a broad range of expenses, and the allowable rate of return. Through universal support, the government provides an incentive for taxpayers such as Coastal to extend the network by investing in the necessary loops. But the payments are made as subsidies to income, not contributions to capital. The end result is the same—citizens in rural areas are offered telephone service—but the characterization of the payments is different under § 118. In the direct grant context, the payments are a contribution to capital. But because the payments in the instant case were calculated based on actual investment and expenses, they were intended to supplement income by increasing the rate of return.

### D. The CB & Q Five Factor Inquiry

The parties also offer thorough arguments on each of the five factors listed by the Supreme Court in *CB & Q*.[17] The Supreme Court stated that these factors were "distilled" from *Brown Shoe* and *Detroit Edison* and that they should be considered as "some of the characteristics of a nonshareholder contribution to capital." *CB & Q*, 412 U.S. at 413, 93 S.Ct. 2169. Coastal maintains that the universal service payments satisfy all of the *CB & Q* criteria. The Government argues that none of the criteria are satisfied. But it is unclear to the Court how some of these factors should be applied to the universal service support payments at issue in the instant case.

For example, the third factor is whether the transfer was "bargained for." The universal support payments were not "bargained for" in the traditional sense of the word. The verb "to bargain" means "to negotiate over the terms of a purchase, agreement, or contract; haggle." *Webster's Collegiate Dictionary* 99 (11th ed.2003). Where bargaining has taken place, the transferee and the transferor have engaged in a give and take. In cases where courts and the IRS have found that a given transaction satisfies this element, the parties have engaged in some type of negotiations.

For instance, in *G.M. Trading Corp. v. Commissioner*, a case where the "bargained for" prong was uncontested, the parties agreed that the taxpayer and the Mexican Government engaged in negotiations over the terms of the contract and the amount of currency to be transferred. 106 T.C. No. 13, 106 T.C. 257, 261 (overruled on other grounds by *G.M. Trading Corp. v. Comm'r*, 121 F.3d 977 (5th Cir. 1997)). Similarly, in Revenue Ruling 93–

---

**17.** Five characteristics of a nonshareholder contribution to capital were set forth by the Supreme Court in *CB & Q*:

(1) It certainly must become a permanent part of the transferee's working capital structure;

(2) It may not be compensation, such as a direct payment for a specific, quantifiable service provided for the transferor by the transferee;

(3) It must be bargained for;

(4) The asset transferred foreseeably must result in benefit to the transferee in an amount commensurate with its value;

(5) And the asset ordinarily, if not always, will be employed in or contribute to the production of additional income and its value assured in that respect.

*CB & Q*, at 412, 413, 93 S.Ct. 2169.

16, *Airport Improvement Grants*, the Internal Revenue Service found that a grant had been bargained for "because the grants are highly sought after with certain meaningful conditions for the grants being negotiated between the [transferee] and the [transferor]." Rev. Rul. 93–16 at 3.

This point is further illustrated by an IRS private letter ruling by Harold E. Burghart. There, the IRS found that a transaction constituted bargained for exchange "because Corp A and City bargained at arms-length on the location and cost of the undergrounding of the lines and related equipment." *Private Letter Ruling*, PLR 200528022, 2005 WL 1657278 (July 15, 2005).[18] In an earlier ruling, *Private Letter Ruling* 200414027, the IRS declared that a transaction was the result of bargained for exchange "because Taxpayer and Generated negotiated and entered into the necessary agreements willingly and at arms length." *Private Letter Ruling*, PLR 200414027, 2004 WL 694535 (April 2, 2004).

In the instant case, Coastal argues that there was bargaining because it could have refrained from participating in the universal service program at any time by simply declining to file the required cost studies or by refusing to build and maintain a network capable of offering each of the "core services" throughout its service area. But the mere fact that a transferee may opt into a transaction does not indicate the presence of a bargaining process. To the contrary, it appears that the FCC and the PSC established, by orders and regulations, the amount of support that Coastal was entitled to receive.[19] Such circumstances do not in any real sense constitute a bargain.

But it is unclear whether this factor should even be applied to the set of facts before the Court in this case. Many government subsidies are not "bargained for" in the traditional sense of the word, and therefore would automatically not meet this prong of the *CB & Q* test. But it is difficult to imagine that such a subsidy could never be a contribution to capital because of the lack of "bargaining," even though that is what the *CB & Q* factors tend to suggest. *See CB & Q*, 412 U.S. at 414, 93 S.Ct. 2169 ("The facilities were not in any real sense bargained for by CB & Q. Indeed, except for the orders by state commissions and governmental subsidies, the facilities most likely would not have been constructed at all."). Does the inapplicability of the "bargained for" factor indicate that it should not be considered under the facts of this case? Or is its inapplicability determinative of the issue? Despite these questions, at the very least, the lack of a true bargained for exchange supports the Court's holding that the universal service payments were not a contribution to capital.

Other factors also fail to provide clarity. The fourth factor is whether the asset transferred foreseeably results in a benefit to the transferee in an amount commensurate with its value. As Coastal notes in its brief, a "cash" payment always provides a benefit commensurate with its value. But this truism sheds no guiding light on the substantive issue at hand, because a "cash" payment can be either income or a contribution to capital.

Where the asset transferred is something other than cash, an examination of the benefit to the transferee may offer insight as to whether the asset was a

18. Private letter rulings, like revenue rulings, may not be cited or relied on as precedent. In the instant case, the Court does not rely on these IRS rulings for any precedential value.

19. Moreover, Coastal may not have had as much discretion as it suggests. If no carrier offers universal services, the state may direct a carrier to do so. 47 U.S.C. § 214(e)(3).

contribution to capital. For example, in *CB & Q* itself, the government made payments to the taxpayer railroad specifically for the improvement of highway crossings and signals. The Court reasoned that "while some incremental benefit from lower accident rates, from reduced expenses of operating crossing facilities, and from possibly higher train speed might have resulted, these were incidental and insubstantial in relation to the value [the taxpayer sought to be depreciated]." 412 U.S. at 414, 93 S.Ct. 2169. The Court considered this as a factor in holding that the payments were not a contribution to capital. *Id.* But in the instant case, it is unclear to the Court how this factor should be applied to a cash payment, particularly where the use of the funds was not as narrowly restricted as it was in the *CB & Q* case. *See* Part III(C), *supra.*

The Government proposes a different inquiry under this factor: whether the company becomes a more valuable company as a result of the transaction. There are several problems with this approach. First, this is not the factor articulated by the Supreme Court in *CB & Q*, and the Government has offered no authority to support its alternative interpretation on this point. Second, this presents an inquiry beyond the scope of the issue in the case.

Because of these and other questions, the Court finds that a detailed holding as to each of the five *CB & Q* factors would not be helpful in resolving the ultimate issue. The Supreme Court acknowledged that the five factors are merely "some of the characteristics" of a nonshareholder contribution to capital, and, in the instant case, there are other characteristics that provide clearer guidance as to the contributor's motivation in making the universal support payments. As discussed above, the mechanisms by which the universal support payments were calculated and distributed indicates that the motivation was to supplement revenue. Because the calculations factored in a broad range of expenses and a revenue requirement, the payments were designed to supplement Coastal's income. Therefore, the payments are not excludable from income as a nonshareholder contribution to capital under § 118.

## IV. ANALYSIS OF THE GEORGIA ACCESS FUND

■ In the wake of the federal universal service mandates, states began to establish universal service programs of their own. In 1995, the Georgia General Assembly enacted the Telecommunications and Development Act of 1995. O.C.G.A. §§ 46–5–160, et. seq. The purpose of the Act was to "[a]ssure reasonable cost for universal access to basic telecommunications services throughout Georgia" and "[e]ncourage investment in Georgia's telecommunications infrastructure." O.C.G.A. § 46–5–161(b)(3)–(4).

Pursuant to this Act, "Tier 2" local exchange companies like Coastal were directed to reduce their intrastate switched access charges to achieve parity with the rates they charged for switching interstate calls.[20] O.C.G.A. § 46–5–166(f)(2). This rate reduction was to be accomplished in eight equal increments between July 1, 1996 and July 1, 2000.

Additionally, the legislature gave the Public Service Commission (the "PSC") the authority to establish a Universal Access Fund to assist with the transition to lower rates. In June of 1995, the PSC determined that there was a need for the

---

20. Tier 2 companies are those companies with less than 2 million access lines within Georgia holding a certificate of public convenience and necessity issued by the commission. O.C.G.A. § 46–5–162(10)(B).

fund authorized by O.C.G.A. § 46–5–166(f)(2) ("the Phase III fund"). For the 1998 calendar year, Coastal received disbursements in the amount of $302,912 under the Phase III fund.

Like the federal universal support funds, the payments Coastal received through the Georgia Access Funds were intended as a supplement to income rather than as a contribution to capital. Specifically, the purpose of the Phase III fund was to provide for the recovery of any net reduction of revenue as a result of a phase down in access charges. O.C.G.A. § 46–5–166(f)(2) had the effect of lowering the rates for intrastate long-distance calls. The Phase III fund was implemented to smooth the transition to lower intrastate long-distance rates, based on telephone company revenue levels prior to the rate change. *In re: Universal Access Fund,* Docket 5825–U, Interim Order (June 20, 1996) at 3. As Coastal explains in its brief, the purpose of the funds was to allow qualifying local exchange carriers "to recover revenues lost as a result of a mandated reduction of intrastate charges." (Doc. 31 at 11.) [21]

In order to receive these funds, Coastal was required to submit application worksheets setting forth specific revenue data. (Doc. 28, Attachments 10–15.) The worksheets calculated the difference between revenue based on the July 1, 1995 intrastate rate, and the revenue based on the new reduced rate that sought parity with interstate rates. This calculation determined the revenue Coastal lost because of the reduction in intrastate rates. Based on this lost revenue, Coastal was awarded a transition amount totaling $302,912 for 1998.

Although this is a highly simplified description of the worksheets, the calculations used to determine the amount of payments show that the funds were designed to supplement the revenue lost as a result of the mandated rate reduction on intrastate calls. Because the purpose of the funds was to supplement revenue, they should be considered as income and not as a contribution to capital.

## V. CONCLUSION

The Court holds that the Universal Service Support payments and the Georgia Access Funds are not excludable from income under § 118(a). Accordingly, Plaintiff's Motion for Summary Judgment is **GRANTED** and Defendant's Motion for Summary Judgment is **DENIED**.

---

21. The PSC's later order regarding the administration of the Phase III fund further illustrates its desire to provide supplemental income for telecommunications companies. Specifically, the order adopts the following principles to be used in the fund's administration: "1) verifying revenue lost by Tier 2 carriers who request disbursement from the fund; 2) identifying potential non-basic rates that can be implemented; 3) identifying any basic rate increase that can be implemented; 4) identifying the revenue loss for UAF collection; and 5) passing the net revenue reduction of access charges on to consumers." *In re Universal Access Fund,* Docket 5825–U, Order at 12 (August 30, 1996).