# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 4, 2011

Lyle W. Cayce
Clerk

No. 09-50651

AT&T, INC.,

Plaintiff - Appellant

v.

UNITED STATES OF AMERICA,

Defendant - Appellee

Appeal from the United States District Court
for the Western District of Texas

Before BARKSDALE, DENNIS, and OWEN, Circuit Judges.

DENNIS, Circuit Judge:

The issue in this federal income tax case is whether the plaintiff-taxpayer, AT&T Inc., an interstate telecommunications company, must pay income taxes on the funds it received from federal and state governmental entities for providing "universal service"—*viz.*, affordable telephone service mainly for lower-income consumers and those in high-cost rural, remote or isolated areas—or else is entitled to treat those funds as nonshareholder contributions to capital under the Internal Revenue Code, *see* 26 U.S.C. § 118(a). The district court held that the taxpayer was not entitled to a refund of income taxes paid on the funds because the "universal service" support payments were income rather than capital contributions. We affirm the judgment of the district court.

No. 09-50651

## BACKGROUND

"Universal service" refers to the goal, first announced in the Communications Act of 1934, "'to make available, so far as possible, to all the people of the United States, . . . a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges.'" *Tex. Office of Pub. Util. Counsel v. FCC*, 183 F.3d 393, 405-06 (5th Cir. 1999) (quoting 47 U.S.C. § 151) (alteration made to reflect 1934 text); *see also Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608, 614 (5th Cir. 2000).

The FCC is charged with the authority and duty of carrying out the universal service mandate. 47 U.S.C. §§ 151, 254, 256; *Tex. Office of Pub. Util. Counsel*, 183 F.3d at 405-06. Originally, rather than relying on market forces alone, the FCC "used a combination of implicit and explicit subsidies" to promote universal service. *Tex. Office of Pub. Util. Counsel*, 183 F.3d at 406. "Explicit subsidies provide carriers or individuals with specific grants that can be used to pay for or reduce the charges for telephone service. This form of subsidy includes using revenues from line charges on end-users to subsidize [service to] high-cost [users] and to support the Lifeline Assistance program for low-income subscribers." *Id.* "Implicit subsidies are more complicated and involve the manipulation of rates for some customers to subsidize more affordable rates for others. For example, the regulators may require the carrier to charge 'above-cost' rates to low-cost, profitable urban customers to offer the 'below-cost' rates to expensive, unprofitable rural customers." *Id.*

"In 1996, Congress amended the Act to introduce competition into local telephone service, Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56, which had traditionally been provided through regulated monopolies." *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1098 (D.C. Cir. 2009); *see also* 47 U.S.C. § 251 *et seq*. In doing so, "Congress recognized" that because the "system of implicit subsidies can work well only under regulated conditions," the existing

2

system of universal service support payments needed "to be re-examined." *Tex. Office of Pub. Util. Counsel*, 183 F.3d at 406.

"To attain the goal of local competition while preserving universal service, Congress directed the FCC to" (1) institute a Federal-State Joint Board to recommend changes in the FCC's regulations that define and implement universal service; and (2) implement the recommendations from the Joint Board by promulgating rules to carry them into effect. *Id.*; *see also* 47 U.S.C. § 254(a). Further, by § 254(b), Congress "direct[ed] the Joint Board and the Commission to base policies for the preservation and advancement of universal service on six enumerated principles, plus such 'other' principles as the Joint Board and the Commission may establish." *Rural Cellular Ass'n*, 588 F.3d at 1098. The enumerated principles are: (1) "Quality services should be available at just, reasonable, and affordable rates"; (2) "Access to advanced telecommunications and information services should be provided in all regions of the Nation"; (3) "Consumers in all regions of the Nation, including low-income consumers and those in rural, insular, and high cost areas, should have access to telecommunications and information services . . . at rates that are reasonably comparable to rates charged for similar services in urban areas"; (4) "All providers of telecommunications services should make an equitable and nondiscriminatory contribution to the preservation and advancement of universal service"; (5) "There should be specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service"; and (6) "Elementary and secondary schools and classrooms, health care providers, and libraries should have access to advanced telecommunications services." 47 U.S.C. § 254(b).

The Telecommunications Act of 1996 also allowed the states to develop their own universal service support systems, so long as those "regulations [are] not inconsistent" with the FCC's rules "to preserve and advance universal

No. 09-50651

service" in telecommunications. *Id.* § 254(f). Pursuant to this authority, California, Kansas and Texas adopted universal service regulations consistent with the FCC's rules.

The FCC mandate to provide universal service is now fulfilled through payments to telecommunications providers by a universal service fund ("USF"). In addition to the high-cost support program, which is designed mainly to provide affordable telephone service to consumers in high-cost rural or isolated areas, the USF supports programs for low-income customers, schools, libraries, and health care providers. "High-cost support disbursements, however, overwhelmingly represent the largest category of USF expenditures, accounting for 61.6 percent of USF disbursements in 2007." *Rural Cellular Ass'n*, 588 F.3d at 1099 (citing Fed.-State Joint Bd. on Universal Serv., *Universal Service Monitoring Report* tbl.1.11 (2008)). California, Kansas and Texas have instituted similar USFs in each state. Only the 1998 and 1999 payments to AT&T by those state USFs and by the federal USF are at issue in the instant case. AT&T claims that both federal and state payments should be treated as capital contributions, not income.

Support for the state and federal USFs comes from assessments, made by the USF administrators, the FCC, and the state utility commissions, requiring mandatory contributions to be paid by "all providers of telecommunications services." 47 U.S.C. § 254(b)(4); *see also* Tex. Util. Code Ann. § 56.022(a); Kan. Stat. § 66-2008(a). "Every telecommunications carrier that provides interstate telecommunications services [must] contribute, on an equitable and nondiscriminatory basis, to the specific, predictable, and sufficient mechanisms established by the [FCC] to preserve and advance universal service." 47 U.S.C. § 254(d). Similarly, every "carrier that provides intrastate telecommunications services [must] contribute, on an equitable and nondiscriminatory basis, in a manner determined by the State to the preservation and advancement of

4

No. 09-50651

universal service in that State." *Id.* § 254(f). "[C]ontributors almost always pass their contribution assessments through to their customers." *Rural Cellular Ass'n*, 588 F.3d at 1099 (citing *Alenco Commc'ns, Inc.,* 201 F.3d at 620).

Pursuant to the statutory provisions and the FCC's and the states' rules, disbursements are calculated by the respective commissions and paid to the carriers providing federal and state universal services. The universal service payments are designed to offset the telephone companies' added costs or decreased revenue associated with servicing high-cost and low-income users. The USF payments for servicing high-cost users are based upon how much more than the average it costs to integrate those users into the telephone system. *See* 47 C.F.R. § 36.631; *see also* 16 Tex. Admin. Code § 23.133 (1999); Kan. Stat. § 66-2008(d); *In re Rulemaking on the Commission's Own Motion into Universal Service and Compliance with the Mandates of Assembly Bill 3643*, 68 CPUC 2d 524, 1996 WL 651546, at *1-2 (Cal. Pub. Util. Comm'n 1996). The USF payments for servicing low-income users are designed to decrease or eliminate certain charges that those users would otherwise have had to pay. 47 C.F.R. §§ 54.403(b)-(c) (1997), 54.411(a); *see also* 16 Tex. Admin. Code § 23.142(d)(2) (1999). To be eligible to receive these disbursements of USF funds, a carrier must offer the services designated as "universal" by the FCC and advertise the availability of those services and the charges for such services. 47 U.S.C. § 214(e)(1).

From the state and federal USFs, AT&T received USF payments of $723.5 million in 1998 and $831.3 million in 1999. AT&T recorded these amounts as "revenue" for financial and regulatory accounting purposes. AT&T deposited these USF payments into its general bank account, along with other customer revenues, from which operating expenses and other costs were paid. AT&T did not earmark or track its use of the USF payments it received. On its 1998 and 1999 federal income tax returns, however, AT&T did not include its USF receipts

5

No. 09-50651

in its gross income. As a result, AT&T did not pay $505,245,517 in income taxes on the payments it received from the USFs in 1998 and 1999. AT&T did, however, treat the mandatory contributions it was required to make to the USFs as deductible business expenses in 1998 and 1999. The IRS determined that AT&T had incorrectly failed to report the USF payments as income. AT&T paid the income tax deficiencies assessed by the IRS and filed administrative claims for a refund, which were denied.

AT&T filed this suit in federal district court seeking tax refunds totaling $505,245,517. AT&T contended that the USF payments were capital contributions excludable from its gross income under 26 U.S.C. § 118(a). The Government filed a motion for summary judgment, arguing that the undisputed facts and applicable law demonstrate that the government payors of USF support payments did not intend to make capital contributions to AT&T in making payments from the USFs; and that they instead intended to supplement the carriers' operating income by compensating them for some of their costs of servicing high-cost customers and by reimbursing carriers for discounts that they were required to give low-income consumers. The Government further relied on the Eleventh Circuit's decision in *United States v. Coastal Utilities, Inc.*, 514 F.3d 1184 (11th Cir. 2008), adopting and affirming *United States v. Coastal Utilities, Inc.*, 483 F. Supp. 2d 1232 (S.D. Ga. 2007), which held that payments from USFs to support high-cost users did not constitute capital contributions.

AT&T opposed the motion, arguing that there was a genuine issue as to a material fact, *viz.*, whether the FCC and state payors intended to make contributions to AT&T's capital in making the USF payments, which required a trial; that the USF payments were intended to pay for the expansion and upgrading of the carriers' network infrastructure and must be treated as capital contributions; and that *Coastal Utilities* was erroneously decided because the

No. 09-50651

court there did not examine the five requirements for a payment to be held to be a capital contribution set forth in *United States v. Chicago, Burlington & Quincy Railroad Co.*, 412 U.S. 401, 413 (1973) (hereinafter *CB&Q*).

The district court referred the Government's motion for summary judgment to a magistrate judge, who recommended that the court should grant the motion. She indicated that "[t]he parties agree that the test for determining whether a payment is a contribution to capital is the transferor's intent." However, she rejected AT&T's argument that the court is required to rigidly apply the test identified in *CB&Q*. Instead, the magistrate judge determined that the court could discern the state and federal governments' intent by examining the method by which the FCC and state utility commissions decided to make payments from the USFs to support service to high-cost and low-income subscribers. The magistrate judge stated that these payments were intended to supplement "lost revenues" from servicing these customers and that "the cost of capital improvements is not part of the calculation of the universal service payments"; "[a]lthough the cost of capital improvements [such as building telephone lines] undoubtedly affects the amount a carrier claims, the computations of payments focuses on revenue (the amount of universal service charges), not capital improvements." Therefore, because "carriers provide service at discounted rates and governments reimburse carriers for revenues lost in providing discounted services," nothing in the payment structure for servicing high-cost or low-income customers directly implicates capital contributions. Accordingly, the magistrate judge rejected AT&T's contention that there was a genuine issue of material fact requiring a trial. She stated that "AT&T [had] submitted a large volume of summary-judgment evidence . . . but did not explain why or how this evidence raises a material fact question" and that she had "found nothing raising a fact question about whether universal service payments to AT&T constitute non-shareholder contributions to capital."

7

No. 09-50651

After reviewing the record, the recommendations of the magistrate judge, and the arguments of the parties, the district court accepted and adopted the magistrate judge's recommendation in its entirety, and granted the government's motion for summary judgment, rejecting AT&T's claim for a refund of income taxes paid. AT&T appealed.

## STANDARD OF REVIEW

"[I]t is well settled that an appellate tribunal may affirm a trial court's judgment on any ground supported by the record." *Lee v. Kemna*, 534 U.S. 362, 391 (2002). "In determining whether a district court properly granted summary judgment, this Court must review the record under the same standards that guided the district court." *Little v. Liquid Air Corp.*, 952 F.2d 841, 847 (5th Cir. 1992). "We must review the evidence, as well as the inferences that may be drawn from the evidence, in the light most favorable to the party that opposed the motion for summary judgment." *Id.* "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[1]

## DISCUSSION

For the reasons assigned hereinafter, we agree with the district court that the record reveals no genuine dispute as to any material fact and that the defendant is entitled to judgment as a matter of law. In summary, under the Supreme Court's decisions and the Internal Revenue Code, whether a payment to a corporation by a non-shareholder is income or a capital contribution to the

---

[1] While this case was pending before this court, the text of Rule 56 changed. This change was meant to "carr[y] forward the summary-judgment standard expressed in former subdivision (c)." Fed. R. Civ. P. 56 advisory committee note (2010 Amendments). Thus, while the district court and this court rely on slightly different language in concluding that summary judgment is warranted and the United States is entitled to judgment as a matter of law, both represent the same legal standard.

corporation is controlled by the intention or motive of the transferor. When the transferor is a governmental entity, its intent may be manifested by the laws or regulations by which it effectuates the payment to the corporation. In the present case, the statutes authorizing the universal service programs, the administrative orders establishing the USFs, and the regulations implementing the raising of revenues for the USFs and the payments from them to AT&T and its subsidiaries, taken together, demonstrate an intent to supplement the income of the telephone companies, rather than to make capital contributions to them. In addition, in *CB&Q*, the Supreme Court indicated that five characteristics, distilled from its jurisprudence, can serve as hallmarks for the transferor's intent. Four of the five, and ordinarily the fifth, must be satisfied before a court can conclude that a transfer was a capital contribution. Applying that test, we again conclude that the governmental transferors in the present case did not intend to make capital contributions to the telephone companies because the transfers fail to satisfy three of the five factors. Therefore, under either the statutory-regulatory construction analysis or the *CB&Q* five-factor test, the universal services payments were not contributions to capital but were income to AT&T.

## I.

"Section 61(a) of the Internal Revenue Code provides a broad definition of 'gross income': 'Except as otherwise provided in this subtitle, gross income means all income from whatever source derived.' 26 U.S.C. § 61(a)." *Comm'r v. Schleier*, 515 U.S. 323, 327 (1995). The Supreme Court has "repeatedly emphasized the 'sweeping scope' of this section and its statutory predecessors." *Id.* at 327-28 (quoting *Comm'r v. Glenshaw Glass Co.*, 348 U.S. 426, 429 (1955)) (citing *United States v. Burke*, 504 U.S. 229, 233 (1992); *Helvering v. Clifford*, 309 U.S. 331, 334 (1940)). The Court has "also emphasized the corollary to § 61(a)'s broad construction, namely, the 'default rule of statutory interpretation

No. 09-50651

that exclusions from income must be narrowly construed.'" *Id.* at 328 (quoting *Burke*, 504 U.S. at 248 (Souter, J., concurring in judgment)) (citing *Burke*, 504 U.S. at 244 (Scalia, J., concurring in judgment); *United States v. Centennial Sav. Bank FSB*, 499 U.S. 573, 583 (1991); *Comm'r v. Jacobson*, 336 U.S. 28, 49 (1949)).

AT&T recognizes § 61(a)'s "sweeping" definition and concedes that its receipts of universal services payments constitute gross income unless they are expressly excepted by 26 U.S.C. § 118(a), which provides: "In the case of a corporation, gross income does not include any contribution to the capital of the taxpayer."

"'[C]ontribution to capital' is not expressly defined by statute." *Coastal Utils.*, 514 F.3d 1184, *aff'g* 483 F. Supp. 2d at 1238. But "the legislative history of § 118 explicitly states that the statute was meant to 'place[] in the Code the Court decisions on this subject.'" *Id.* (second alteration in original) (quoting H.R. Rep. No. 83-1337, at A-38 (1954), *reprinted in* 1954 U.S.C.C.A.N. 4017, 4042; S. Rep. No. 83-1622 (1954), *reprinted in* 1954 U.S.C.C.A.N. 4621, 4648). Therefore, a brief history tracing the development of the Supreme Court's jurisprudence is essential to an understanding of the meaning of the term "contribution to capital" and thus, the tax character of the instant payments.

In *Edwards v. Cuba Railroad Co.*, the Supreme Court held that money from the Cuban government paid to a railroad to "subsid[ize] up to $6,000 per kilometer" of track laid, "and [which was] used for capital expenditures," was a capital contribution, not income. 268 U.S. 628, 629, 630-31 (1925); *see also Springfield St. Ry. Co. v. United States*, 577 F.2d 700, 702 (Ct. Cl. 1978). The Supreme Court explained,

> The subsidy payments were proportionate to mileage completed; and this *indicates a purpose* to reimburse plaintiff for capital expenditures. . . . Neither the laws nor the contracts indicate that

10

No. 09-50651

> the money subsidies were to be used for the payment of dividends,
> interest or anything else properly chargeable to or payable out of
> earnings or income.

*Edwards*, 268 U.S. at 632-33 (emphasis added).

Later, in *Texas & Pacific Railway v. United States*, 286 U.S. 285 (1932), and *Continental Tie & Lumber Co. v. United States*, 286 U.S. 290 (1932), the question was whether the federal government's payments, which were meant to "guarantee[]" the companies "an operating income," were income or capital contributions. *Tex. & Pac. Ry.*, 286 U.S. at 288; *see also Cont'l Tie & Lumber Co.,* 286 U.S. at 293-94. The Court concluded that the monies were income, stating:

> The sums received under the act were not subsidies or gifts—that
> is, contributions to the capital of the railroads—and this fact
> distinguishes cases such as *Edwards. . . .* Here the[ sums] were to
> be measured by a deficiency in operating income, and might be used
> for the payment of dividends, of operating expenses, of capital
> charges, or for any other purpose within the corporate authority,
> just as any other operating revenue might be applied.

*Tex. & Pac. Ry.,* 286 U.S. at 289-90; *see also Cont'l Tie & Lumber Co.,* 286 U.S. at 293-94 (stating that payments that "guaranteed the payment of any deficiency below a fixed minimum of operating income" and were motivated by an effort to compensate for "losses in income due to" government programs were income).

Subsequently, in *Detroit Edison Co. v. Commissioner*, 319 U.S. 98, 99 (1943), the Court ruled on the tax character of payments by customers to the company for the "estimated cost of the necessary construction" for extending "facilities" to service those customers. The Court indicated that the transfers could be taxed as income and therefore "[t]he Commissioner was warranted in adjusting the" company's basis in certain items purchased with these monies from the customers. *Id.* at 103. The Court stated that "[t]he payments were to the customer the price of the service" and thus they should be treated as such, i.e., income. *Id.*

11

No. 09-50651

In *Brown Shoe Co. v. Commissioner*, 339 U.S. 583, 584 (1950), the Court concluded that "the payment of cash and the transfer of other property to [the company] by certain community groups as an inducement to the location or expansion of [the company's] factory operations in the communities" were capital contributions. The Court explained that "[u]nder these circumstances the transfers manifested a definite *purpose* to enlarge the working capital of the company." *Id.* at 591 (emphasis added).

The latest guidance from the Supreme Court on the subject of what constitutes a nonshareholder contribution to capital was provided in *CB&Q*. There, the Court held that "the intent or motive of the transferor . . . determined the tax character of the transaction." *CB&Q*, 412 U.S. at 411. The Court reasoned that "the decisional distinction between *Detroit Edison* and *Brown Shoe* rested upon the nature of the benefit to the transferor, rather than to the transferee, and upon whether that benefit was direct or indirect, specific or general, certain or speculative." *Id.*; *see also G.M. Trading Corp. v. Comm'r,* 121 F.3d 977, 980 (5th Cir. 1997); *Deason v. Comm'r*, 590 F.2d 1377, 1378 (5th Cir. 1979); *Springfield St. Ry. Co.*, 577 F.2d at 702-03.

Moreover, adverting to *Detroit Edison* and *Brown Shoe,* the *CB&Q* Court concluded, "[w]e can distill from these two cases some of the characteristics of a nonshareholder contribution to capital under the Internal Revenue Codes":

> [1] It certainly must become a permanent part of the transferee's working capital structure. [2] It may not be compensation, such as a direct payment for a specific, quantifiable service provided for the transferor by the transferee. [3] It must be bargained for. [4] The asset transferred foreseeably must result in benefit to the transferee in an amount commensurate with its value. [5] And the asset ordinarily, if not always, will be employed in or contribute to the production of additional income and its value assured in that respect.

12

No. 09-50651

*CB&Q*, 412 U.S. at 413. The Court then proceeded to reject CB&Q's contention that it had received capital contributions because the transfers at issue failed to satisfy the third and fourth characteristics, even though the Court noted that the transfers satisfied the second. *Id.* at 413-15. Thus, the Court indicated that although the tax character of a transfer was ultimately determined by the transferor's intent, for a court to hold that a transfer was a capital contribution, each of the first four, and ordinarily the fifth, characteristics must also be satisfied. This is how our circuit has interpreted *CB&Q*'s holding. *G.M. Trading*, 121 F.3d at 980-81; *see also Deason*, 590 F.2d at 1378-79 ("[T]he Supreme Court in [*CB&Q*] enumerated certain requisite characteristics common to nonstockholder contributions to capital under the Internal Revenue Code . . . .").

From the foregoing review of the Supreme Court's cases, we derive these principles: (1) Whether a payment to a corporation by a non-shareholder is income or a capital contribution is controlled by the intention or motive of the transferor. (2) When the transferor is a governmental entity, its intent may be manifested by the laws or regulations that authorize and effectuate its payment to the corporation. (3) Also, a court can determine that a transfer was not a capital contribution if it does not possess each of the first four, and ordinarily the fifth, characteristics of capital contributions that the Supreme Court distilled from its jurisprudence in *CB&Q*. Applying these principles to the facts of this case, we conclude that, either by construing the controlling statutes and regulations or by applying the *CB&Q* five-factor test, the governmental entities in making universal service payments to AT&T did not intend to make capital contributions to AT&T; and thus, that the payments were income to AT&T.

Thus, in this case, we need not pause to determine whether one method of determining the intention or motive of the transferor is more appropriate than the other. By alternately bringing each method to bear on this case, we reach the same result in both applications, thereby reinforcing our conclusion that the

13

universal service payments were intended and must be treated as income to AT&T.

## II.

As we read the statutes authorizing the USF payments, the administrative orders implementing those statutes, and the resulting regulations, the USF payments were not intended to be capital contributions to AT&T, but to be supplements to AT&T's gross income to enable it to provide universal service programs while meeting competition newly introduced by the 1996 Act.

*A.* The Telecommunications Act articulates six "principles" on which the federal USF payment "policies" are to be "base[d]." 47 U.S.C. § 254(b). These principles establish that the payments are intended to "offset" recipients' increased costs or lost revenue in servicing high-cost and low-income users, so that the recipients can provide and expand universal service while remaining competitive in the telecommunications market. *See* H.R. Rep. No. 103-560, at 41 (1994) (stating that the federal USF was intended to "offset[] the high cost of providing local telephone service to rural areas" and "offset the initial telephone installation charge and also defray[] interest expense[s]" for low-income users); *see also* S. Rep. No. 104-23, at 29 (1995). For instance, the first principle on which the federal USF payments are to be based is that "services should be available at just, reasonable, and affordable rates." 47 U.S.C. § 254(b)(1). The third principle states that "[c]onsumers in all regions of the Nation, including low-income consumers and those in rural, insular, and high cost areas, should have access to telecommunications and information services . . . that are reasonably comparable to those services provided in urban areas and that are available at rates that are reasonably comparable to rates charged for similar services in urban areas." *Id.* § 254(b)(3). As explained in the background section, the USF system was developed in recognition of the fact that high-cost and low-income individuals could not readily afford telephone services in the absence of

rate regulation. By seeking to assure that these customers receive "comparable" telephone services at "affordable rates," which are also "comparable" to the rates charged to non–high-cost or low-income users, these principles indicate that the USF payments are intended to compensate the telecommunications companies for the difference between the costs of providing service to high-cost and low-income customers and what those customers can afford to pay, so that the customers can receive service and the companies can remain competitive. *See id.* § 254(b)(1), (3). Of course, the Act's general principles do not specifically address whether the USF payments are intended as capital contributions or income nor how the payments are to be made. However, by linking the payments to the recipient companies' rates charged to non–high-cost or low-income customers, the principles narrowed the mechanisms by which the USF payments could be distributed, making it more likely that they would take the form of income supplements rather than capital contributions.

*B.*     The foregoing statutory principles were implemented by the FCC's Report and Order on universal service. *In the Matter of Federal-State Joint Board on Universal Service*, 12 FCC Rcd. 8776, ¶ 2 (May 8, 1997) (stating that its decisions were "[c]onsistent with the explicit statutory principles"); *id.* ¶ 17 (stating that it was modifying its payment "mechanisms . . . to make them more consistent with the statutory requirements and principles"). The FCC's decision to directly implement the principles, tying USF payments to companies' rates charged to customers for universal services, furthered the likelihood that the USF payments would become part of the companies' income. For example, repeating the language of the first principle, quoted above, in its introduction to the Report and Order, the FCC declared that its "[u]niversal service support mechanisms . . . are designed to increase subscribership by keeping rates affordable." *Id.* ¶ 8. Consistent with the third principle from the Telecommunications Act, the Report and Order described how the FCC would

No. 09-50651

achieve the goal of keeping universal service consumers' bills affordable, stating that for high-cost users, the high-cost support payments would be equal to "the cost of providing universal service for high cost areas because it best reflects the cost of providing service in a competitive market for local exchange telephone service." *Id.* ¶ 26. Likewise, the FCC explained that the low-income support program known as Lifeline assistance would be "condition[ed] . . . on the state permitting its carriers to reduce intrastate charges paid by the end user." *Id.* ¶ 326; *see also id.* ¶¶ 351-53, 367 (describing similar principles for the low-income support programs).

In this manner, the implementing administrative document directly put into effect the Act's intention that the USF payments should be equivalent to customers' fees for services. It indicated that USF payments would be designed to offset a portion of the telecommunications company's real cost of providing discounted services to low-income and high-cost customers, thus providing the company with revenue associated with universal service comparable to what it could gain from servicing more affluent low-cost urban customers. Again, it did not specifically state whether the payments were intended as income or capital contributions, but by designing the payment mechanisms to directly implement the Act's policy principles, the Report and Order further narrowed the possibility that the payments could be viewed as anything but income.

C.     What is more, the FCC's Report and Order promulgated new regulations and endorsed certain existing regulations related to universal service. *See*, *e.g.*, *id.* ¶¶ 300, 986. These regulations included the specific mechanisms used to calculate disbursements from the federal USF to the recipient companies, which directly effectuated the principles and policies as described in the Act and Report and Order. Accordingly, as the Eleventh Circuit recognized in *Coastal Utilities,* these mechanisms are fully and finally indicative of the intent underlying the payments: that they were designed to supplement income. 514 F.3d 1184, *aff'g*

No. 09-50651

483 F. Supp. 2d at 1241-42. For example, the regulations explained that the federal high-cost user support program would provide the recipient company 75%, plus a multiplier, of the cost incurred in servicing high-cost users that exceeds "150 percent of the national average for this cost." 47 C.F.R. § 36.631(c)(2). Similarly, the regulation regarding low-income Lifeline assistance stated that the program would provide money so that the recipient companies could "waive" certain charges for Lifeline customers. *Id.* § 54.403(b) (1997). Therefore, as indicated by the statute's principles and the FCC's universal service policy principles, the regulations dictated that the federal USF would directly compensate AT&T for its lost revenue or increased expenses in servicing high-cost and low-income users, assuring AT&T of competitive rates of income from these services. Therefore, USF payments were clearly intended to be income for AT&T and not capital contributions.

*D.*     The functions of the California, Kansas and Texas state USFs are consistent with and analogous to those of the FCC's federal USF. These states' legislators and utility commissions expressly adopted universal service policies similar to and consistent with the federal policies and goals in raising and using USFs. The state USFs are funded by mandatory assessments on companies providing universal service; payments from the USFs to the companies provide telecommunications carriers with money to offset their increased costs or reductions in revenues resulting from servicing high-cost or low-income users and thus provide the companies with competitive rates of return for their services. *See, e.g.*, Cal. Pub. Util. Code § 270(b), 2004 historical note (stating that payments from the current California USF are meant to "compensate telephone corporations for their costs of providing universal service" and that this program is merely a "re-authoriz[ation]" of prior USFs); Kan. Stat. § 66-2008(d) (stating that USF funding is "for the purpose of providing services to and within the service area of the qualified telecommunications [company]"); Tex. Util. Code

17

No. 09-50651

§ 58.001(1) (stating that the policy underlying Texas's USF is to "provide a framework for an orderly transition from the traditional regulation of return on invested capital to a fully competitive telecommunications marketplace," thereby suggesting that Texas USF payments are intended to ensure that telecommunications companies receive competitive returns on their investments); Tex. Util. Code § 56.022(a). Moreover, the state USFs use mechanisms similar to the federal mechanisms described above to calculate the amount of universal service support they provide. *See, e.g.*, Kan. Stat. § 66-2008(d); 16 Tex. Admin. Code § 23.133 (1999); *In re Rulemaking on the Commission's Own Motion into Universal Service and Compliance with the Mandates of Assembly Bill 3643*, 1996 WL 651546, at *2.

In this manner, the authorizing statutes, administrative orders and regulations demonstrate a consistent governmental intent that the USF payments were designed to provide the telephone companies with supplemental revenue to offset their extra costs in or decreased revenue resulting from providing high-cost and low-income customers with affordable telephone services. That intent was implemented by the payment mechanisms, which distribute the USF payments in a manner so as to supplement the recipient companies' revenue from services.

The Supreme Court's decision in *Texas & Pacific Railway* confirms that such a regulatory and legislative framework dictates that the payments were income. As noted above, there the United States had agreed that "[i]f the fruits of [i.e., revenue of] the [company] should fall below a fixed minimum, then the government [would] make up the deficiency." 286 U.S. at 289. The Court explained that these payments were designed to provide the railway with sufficient funds to "rehabilitate[] . . . the road[] as [a] privately owned and operated organization[]" by "stabiliz[ing] [its] credit position . . . by assuring [it] a minimum operating income" and thereby allowing it to seek out loans and

18

develop its business. *Id.* at 288-89. Because the mechanism for calculating the payment to the railway was based upon the railway's revenue, the Court concluded, "[c]learly, then, the amount paid to bring the yield from operation up to the required minimum was as much income from operation as were the railroad's receipts from fares and charges. The sums received under the act were not subsidies or gifts—that is, contributions to the capital of the railroad[]. . . . Here they were to be measured by a deficiency in operating income, and might be used for the payment of dividends, of operating expenses, of capital charges, or for any other purpose within the corporate authority, just as any other operating revenue might be applied. The government's payments were not in their nature bounties, but an addition to a depleted operating revenue . . . ." *Id.* at 289-90; *see also Cont'l Tie & Lumber Co.*, 286 U.S. at 293-94 (stating that payments that "guaranteed the payment of any deficiency below a fixed minimum of operating income" and were motivated by an effort to compensate for "losses in income due to" government programs were income).

Similarly, the policies and payment mechanisms underlying the state and federal USFs demonstrate that the payments were intended to compensate the telecommunications companies for lost revenue and thus were income to the companies. Further supporting this conclusion, like the payments at issue in *Texas & Pacific Railway*, the USFs can be used for the payment of a wide variety of expenses, with the only condition being that the funds go toward costs that fit within the infinitely broad category of payments "for the provision, maintenance, and upgrading of facilities and services for which the support is intended." 47 U.S.C. § 254(e).[2] Therefore, the state and federal USF payments are not

---

[2] The state funds at issue have slightly different formulations of how the USF monies were to be used by the recipient companies. However, AT&T does not argue that the payments from the state and federal funds should be treated differently. Moreover, as noted above, the Telecommunications Act establishes that the state funds' regulations cannot be "inconsistent with the Commission's rules to preserve and advance universal service." 47 U.S.C. § 254(f).

No. 09-50651

excludable from AT&T's income as nonshareholder contributions to capital under 26 U.S.C. § 118.

## III.

Application of the *CB&Q* five-factor test to the facts of this case leads to the same conclusion. In *CB&Q* the Supreme Court stated that while the intent of the transferor is the ultimate test for whether a transfer is a capital contribution, the Court's cases teach that a capital contribution must have at least four, ordinarily five, characteristics. 412 U.S. at 413. The USF payments fail to satisfy three of the four mandatory characteristics, showing that they were not capital contributions but must be recognized as income to AT&T.

*A.*     AT&T fails to show that it "bargained for" the USF payments rather than simply having accepted the unilaterally imposed law and regulations determining the USF payments. *See id.* at 413.  AT&T demonstrates only that it submitted comments to and conducted *ex parte* meetings with the FCC as part of the agency's consideration of how to structure the USF payments. Likewise, prior to the establishment of the state USFs by California, Kansas, and Texas, an AT&T spokesperson testified before legislative and regulatory committees, made presentations, submitted documents and comments, and attended meetings. In Kansas, a company representative sat on "a telecommunications strategic planning committee" during the development of the Kansas universal service support system. However, the Kansas resolution establishing that committee specified that the committee was merely "advisory in nature," helping only to recommend a plan for "future actions by the legislature." Kan. Senate Con. Res. No. 1627 (1994). Therefore, AT&T's evidence demonstrates only that its participation in the development of the state and federal USFs amounted to lobbying and advocacy designed to influence independent legislative and

---

Therefore, any differences must be insignificant.

administrative decisions. Essentially, the statutes and the regulations were unilaterally imposed by law upon AT&T and other carriers and not enacted in exchange for the carriers' quid pro quo.

Accordingly, AT&T's lobbying and advocacy did not amount to bargaining in the *CB&Q* sense. A bargain requires mutual "negotiat[ion]" or "haggl[ing]." *See Coastal Utils.*, 514 F.3d 1184, *aff'g* 483 F. Supp. 2d at 1234 (quoting *Webster's Collegiate Dictionary* 99 (11th ed. 2003)) (internal quotation marks omitted). Accordingly, the Supreme Court stated in *CB&Q* that a transaction that "in substance was unilateral" cannot be bargained for. 412 U.S. at 414; *see also Springfield St. Ry. Co.*, 577 F.2d at 703. As a result, taking all of AT&T's arguments and cited evidence in the light most favorable to it, the record demonstrates that the state and federal USFs may have been influenced by AT&T's efforts, but not that they were bargained for by the company. The company sought only to influence the governmental entities' unilateral decision-making, not to engage in a mutual exchange of commitments. *Coastal Utils.*, 514 F.3d 1184, *aff'g* 483 F. Supp. 2d at 1249 ("[I]t appears that the FCC and the [local utility commission] established, by orders and regulations, the amount of support that Coastal was entitled to receive. Such circumstances do not in any real sense constitute a bargain." (footnote omitted)); *see also Lehnert v. Ferris Faculty Ass'n*, 500 U.S. 507, 528 (1991) (noting that in the First Amendment context, lobbying activities are distinct from collective bargaining); *520 S. Mich. Ave. Assocs., v. Shannon*, 549 F.3d 1119, 1132-33 (7th Cir. 2008) (drawing a distinction between lobbying and collective bargaining).

B.      Notwithstanding AT&T's assertion to the contrary, the USF payments also were paid to AT&T to compensate it for providing certain specific services. Thus, AT&T fails to demonstrate the payments satisfy the second *CB&Q* characteristic of a capital contribution—that the transfer not be made as "compensation . . . for

a specific, quantifiable service provided for the transferor by the transferee." *CB&Q*, 412 U.S. at 413.

Whether a payment is compensation for a specific, quantifiable service is illustrated by the Supreme Court's pair of decisions in *Detroit Edison* and *Brown Shoe*. In the former, the Court found the transfers to be compensation for services and therefore income; in the latter, the Court concluded that the transfers were not compensation for services and thus, could be capital contributions. The payments in *Detroit Edison* resulted from the company's agreement with customers that if the customers "pa[id] the estimated cost of the necessary construction," the company would expand previously unavailable services to reach those individuals. 319 U.S. at 99. The Court held that these payments, either from single individuals or shared among several customers, were income and not capital contributions because "[t]he payments were to the customer the price of the service. . . . It is enough to say that it overtaxes imagination to regard the farmers and other customers who furnished these funds as makers either of donations or contributions to the Company." *Id.* at 102-03. This was true even though "[c]ustomers' payments [were] not appropriated to the particular construction nor earmarked for it, but [went] into the Company's general working funds." *Id.* at 100. By contrast, in *Brown Shoe*, the transfers resulted from philanthropic efforts "by certain community groups as an inducement to the location or expansion of petitioner's factory operations" in the community. 339 U.S. at 584. The Court explained that these transfers were capital contributions because the philanthropic groups "neither sought nor could have anticipated any direct service or recompense whatever, their only expectation being that such contributions might prove advantageous to the community at large." 339 U.S. at 591. In this manner, the Court indicated that to be compensation for services, a transfer does not need to be directly or immediately used for the provision of services; nor does it need to benefit all

22

No. 09-50651

transferors commensurately with their individual contributions. Instead, consistent with the Court's statements that a transferor's intent ultimately determines the tax character of the transfer, whether a payment is compensation for services turns on whether it is given in expectation of a specific service to the transferor or whether it is given simply to pay for or generate a service to others.

Applying those precepts here, the USF payments were compensation to AT&T for the specific and quantifiable services it performed for high-cost and lower-income users as well as for developing and maintaining universal service, which renders a service for all consumers by making the telecommunications system more useful and valuable to every customer. The state and federal USFs draw their monies from assessments levied by the FCC and state utility commissions against the telecommunications companies,[3] which are then passed along to customers. *See Rural Cellular Ass'n*, 588 F.3d at 1099; *see also Citizens' Util. Ratepayer Bd. v. State Corp. Comm'n*, 956 P.2d 685, 713 (Kan. 1998). AT&T acknowledges, consistent with the FCC's independent findings, that the expansion of universal telephone service provides a service to all telephone users by "mak[ing] the network more valuable to all," in that it allows all customers to reach a greater number of individuals. *See Federal-State Joint Board on Universal Service*, 12 FCC Rcd. 8776, ¶ 8. Thus, the USFs are in effect a vehicle or conduit by which the telecommunications carriers are compensated for the specific, quantifiable services that they provide directly to high-cost and lower-income customers and for the universal, system-wide service they provide in making those customers accessible to other consumers in the system. It is enough to say that it overtaxes imagination to regard customers who furnished funds for telecommunications service, which are then used by the

---

[3] *See* 47 U.S.C. § 254(d); Cal. Pub. Util. Code § 270(b); Kan. Stat. § 66-2008(a); Tex. Util. Code Ann. § 56.022(a).

No. 09-50651

telecommunications companies to improve services, as makers either of donations or contributions to the company. *Cf. Detroit Edison*, 319 U.S. at 102.

C.      Finally, AT&T fails to demonstrate that the payments it received from the federal and state USFs became a permanent part of AT&T's working capital structure, as is demanded by the first *CB&Q* requirement. *See CB&Q*, 412 U.S. at 413. AT&T acknowledges that a payment becomes "a permanent part of its 'working capital structure' if the funds are *committed* for investment and use in the business." AT&T Opening Br. 24-25 (emphasis added). AT&T does not contest, however, that the USF payments went, un-earmarked, into its general revenue accounts where they were available for a multitude of purposes other than contributions to capital. AT&T argues that the legislative and regulatory background for the payments indicates that they were intended to increase AT&T's investment in capital assets. However, universal service support did not provide money exclusively for the specific purpose of making capital improvements, such as building an airport or locating and constructing a plant. Instead of providing the money only for that type of investment, the governments provided supplemental income so as to provide the telephone companies an enhanced return on their investment. Through universal support, the governments provided an incentive for taxpayers such as AT&T to extend the network by investing in additional construction. But the payments were made as supplements to income, not direct contributions to capital committed exclusively to such construction. *See Coastal Utils.*, 514 F.3d 1184, *aff'g* 483 F. Supp. 2d at 1248.

Therefore, having failed to demonstrate that the USF payments had more than one or two of the essential characteristics of a capital contribution instead of four or more as prescribed by *CB&Q*, AT&T has not carried its burden to show that the USF support payments were capital contributions under the *CB&Q* test.

24

No. 09-50651

## **CONCLUSION**

For these reasons, the judgment of the district court is AFFIRMED.