# United States Tax Court

REVIEWED
164 T.C. No. 5

CF HEADQUARTERS CORPORATION,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 22321-12.                    Filed March 4, 2025.

————

 In the aftermath of the September 11, 2001, terrorist attacks on the World Trade Center in New York, New York, the State of New York established grant programs to aid businesses affected by the attacks. In 2007 P received a cash disbursement under one such grant program. Under the terms of its grant disbursement agreement, the grant proceeds were intended to be used for expenses in five eligible categories, including rent. P's payment requisition form requested reimbursement for rent paid by P's affiliates. Along with the payment requisition form, P attached a report of employment form to show that it satisfied certain employment commitments it made in exchange for the grant proceeds. P excluded the grant proceeds from its gross income for 2007. R examined P's 2007 return and determined in a Notice of Deficiency that P was required to include the grant proceeds in its gross income and that P is liable for an accuracy-related penalty under I.R.C. § 6662(a) and (b)(2) for an underpayment of tax required to be shown on a return due to a substantial understatement of income tax.

 P maintains that the grant proceeds are excludable as a contribution to the capital of a corporation under I.R.C. § 118 or, in the alternative, as a gift under I.R.C. § 102 or as a qualified disaster relief payment under I.R.C. § 139.

**Served 03/04/25**

P further contends that it is not liable for the accuracy-related penalty because there was substantial authority for its position. R contends that the grant proceeds are includible in gross income and not excludable under any relevant statutory provision.

*Held*: The grant proceeds received by P are not excluded from gross income under I.R.C. § 118, as interpreted by the Supreme Court in *United States v. Chicago, Burlington & Quincy Railroad Co.*, 412 U.S. 401 (1973), because P did not show that the proceeds became part of the working capital.

*Held, further*, I.R.C. § 102 does not deem as gifts transfers of property by a governmental entity to its constituent as government aid from which the governmental entity expects incidental economic benefits, and P may not exclude the grant proceeds as such.

*Held, further*, P may not treat the grant payments as qualified disaster relief payments pursuant to I.R.C. § 139(a) because this section applies only to individuals and not corporations.

*Held, further*, P is not liable for the I.R.C. § 6662(a) accuracy-related penalty.

KERRIGAN, *C.J.*, wrote the opinion of the Court, which FOLEY, BUCH, NEGA, PUGH, ASHFORD, URDA, COPELAND, JONES, TORO, GREAVES, MARSHALL, WEILER, WAY, LANDY, ARBEIT, GUIDER, JENKINS, and FUNG, *JJ.*, joined.

————

*Kevin M. Flynn*, for petitioner.

*Steven Tillem*, *Suzan Akyali*, *Erik M. Sternberg*, and *Maria T. Stabile*, for respondent.

KERRIGAN, *Chief Judge*: Respondent determined a deficiency of $1,056,550 and an accuracy-related penalty pursuant to section 6662(a) of $211,310 with respect to petitioner's 2007 federal income tax. The issues for consideration are whether petitioner (1) must include in its gross income $3,107,500 of grant proceeds it received in 2007 and (2) is liable for a 20% accuracy-related penalty pursuant to section 6662(a).

Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code), in effect at all relevant times, regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts are stipulated and so found. The Stipulations of Facts and the attached Exhibits are incorporated herein by this reference. When petitioner timely filed its Petition, its principal place of business was New York.

*Background*

During 2007 petitioner, CF Headquarters Corp., was a Delaware corporation that was wholly owned by Cantor Fitzgerald, L.P. (Cantor Fitzgerald), a domestic partnership. Cantor Fitzgerald was a holding company and the parent entity of numerous subsidiaries (collectively, Cantor Group) through which it conducted business. The Cantor Group was a global financial services firm that served as a broker and dealer of government securities and commodity futures contracts.

Cantor Fitzgerald Securities was one of the subsidiaries owned by Cantor Fitzgerald. Cantor Fitzgerald Securities served as the "back office" for Cantor Fitzgerald, and employed legal, tax, finance, and human resource professionals which served the myriad of entities that make up the Cantor Group. In 2007 Cantor Fitzgerald Securities employed at least 300 people and had $28,402,971 of revenue.

Before the September 11, 2001, terrorist attacks on the World Trade Center in New York, New York, Cantor Fitzgerald occupied floors 101 through 105 of the north tower of the World Trade Center. Six-hundred and fifty-eight of the firm's approximately 1,000 employees were killed in the attacks. Following the attacks, the Cantor Group used various office spaces it already possessed, including two properties at 110 East 59th Street and 499 Park Avenue in Manhattan.

In response to the World Trade Center attacks, the Empire State Development Corp. (Empire State), in cooperation with the New York City Economic Development Corp., established the World Trade Center Job Creation and Retention Program (JCRP) to provide grants to affected businesses with funding provided by the U.S. Department of Housing and Urban Development. To be eligible for JCRP grants, companies were generally required to create or retain at least 200 jobs in lower Manhattan or New York City for a period of at least seven years. Empire State representatives often negotiated larger employment commitments or longer recapture terms from grantees.

Under the JCRP, grant proceeds were awarded after a company demonstrated that it had complied with its employment commitment requirements and that it had incurred expenses after September 11, 2001, in one of five eligible categories related to employment: (1) wages; (2) payroll taxes; (3) employee benefits; (4) rent; and (5) movable equipment and furniture. Movable equipment and furniture was added as an eligible expense under the JCRP as a programwide change after Empire State and Cantor Fitzgerald began negotiations. All funds disbursed under the JCRP were subject to recapture if the employment requirement was not met per the terms negotiated by Empire State and the grantee.

*Petitioner's JCRP Grant*

The agreement that governs the grant proceeds at issue resulted from the consolidation of two grant disbursement agreements under the JCRP between Empire State and the respective grantees. On March 13, 2003, Empire State entered into a binding grant disbursement agreement (original Euro Brokers grant agreement) with Maxcor Financial, Inc., and its parent company, Euro Brokers, Inc. (collectively, Euro Brokers),[1] with respect to a JCRP grant not to exceed $2.55 million. The original Euro Brokers grant agreement authorized an initial disbursement to Euro Brokers of $1.75 million when the agreement was signed in 2003. When the original agreements were

---

[1] When the original Euro Brokers grant agreement was executed in 2003, Euro Brokers, Inc., and Maxcor Financial, Inc., were corporations unrelated to the Cantor Group. Euro Brokers was an international interdealer brokerage firm that provided market making services to its base of institutional clients with respect to various types of securities and derivatives. Euro Brokers conducted the bulk of its regulated American-based operations through Maxcor Financial, Inc.

consolidated in 2007, the remaining $800,000 of the grant under the original Euro Brokers grant agreement had not been disbursed.

In November 2003 Empire State entered into a similar binding grant disbursement agreement (original Cantor Fitzgerald grant agreement) with Cantor Fitzgerald with respect to a JCRP grant of $6 million. The original Cantor Fitzgerald grant agreement authorized an initial disbursement to Euro Brokers of $1.65 million when the agreement was signed in 2003.[2] When the original agreements were consolidated in 2007, the remaining $4.35 million of the grant under the original Cantor Fitzgerald grant agreement had not been disbursed.

Cantor Fitzgerald acquired Euro Brokers on May 20, 2005. On January 8, 2007, the original Euro Brokers grant agreement and the original Cantor Fitzgerald grant agreement were consolidated when Cantor Fitzgerald and Empire State entered into an Amended and Restated Grant Disbursement Agreement (ARDA) that authorized a JCRP grant totaling $8.55 million. The ARDA prescribed that grant proceeds were to be used by petitioner solely for expenses in the eligible categories incurred after September 11, 2001.

In the ARDA Cantor Fitzgerald committed to retain at all times, subject to recapture of the grant proceeds, at least 643 full-time employees in New York City, with at least 250 of them being employed in lower Manhattan. The ARDA referred to these baselines as the "minimum employment number" and "south of canal zone minimum employment number."[3] Failure to maintain either of these minimum levels of employment for ten years authorized Empire State to recapture some or all of the proceeds that had already been disbursed. The terms of recapture in the ARDA dealt only with petitioner's employment commitments.

Additional disbursements of grant proceeds under the ARDA were calculated on the basis of the number of full-time permanent employee positions created and retained in excess of the sum of the

---

[2] The original Cantor Fitzgerald grant agreement also authorized a second disbursement to Cantor Fitzgerald upon its relocation from its premises it temporarily leased to a permanent space. This second disbursement had not been made by 2007 when the original grant agreements were consolidated.

[3] The south of canal zone area includes the area of Manhattan that is bounded on the north by the centerline of Canal Street, continuing from the Hudson River to Rutgers Street, then southeast along the centerline of Rutgers Street and continuing along the centerline of Rutgers Slip to the East River.

respective minimum employment number and the number of employees which had served as the basis for additional disbursements in prior years. For each job it created and retained south of the canal zone above this baseline amount at the time of its request, Cantor Fitzgerald became entitled to an additional disbursement of $10,000. For each job created and retained in New York City but not south of the canal zone, Cantor Fitzgerald became entitled to an additional disbursement of $7,500. In order to receive an additional disbursement under the ARDA, Cantor Fitzgerald was required to submit a "Report of Employment Form" affirming that the employment requirements were satisfied. Additional disbursements were also subject to use, or reimbursement, for expenses in the five eligible categories. Once petitioner showed it had previously incurred expenses in one of the five categories, no provision of the ARDA restricted how the grant proceeds were to be used.

Attached as an exhibit to the ARDA was a risk analysis performed to determine the fiscal impact, including to state and city tax revenues, if Cantor Fitzgerald had chosen to move its business outside New York City. The parties estimated that Cantor Fitzgerald generated approximately $9.8 million and $10.5 million of tax revenue annually for New York City and the State of New York, respectively.

On September 24, 2007, petitioner requested from Empire State a disbursement of grant proceeds pursuant to the ARDA. Petitioner attached to its disbursement request a report of employment form indicating that it had met its minimum employment commitments. On the form Cantor Fitzgerald reported that the Cantor Group had a total of 1,018 employees, consisting of 368 employees in lower Manhattan and 650 employees elsewhere in New York City, as of September 24, 2007.

Petitioner's disbursement request also included the required payment requisition form describing the expenditures for which it sought reimbursement. Its payment requisition form requested the $3,107,500 distribution as reimbursement for rent expenses. The payment requisition form did not request reimbursement for any other category of eligible uses. Petitioner attached to its disbursement request rent invoices and canceled checks showing rent paid by Cantor Fitzgerald and Cantor Fitzgerald Securities for the Manhattan properties at 110 East 59th Street and 499 Park Avenue in 2006 and 2007, respectively. In total petitioner substantiated to Empire State $3,434,152 of rent paid by the Cantor Group.

On November 28, 2007, Empire State made an additional disbursement of $3,107,500 to petitioner as reimbursement for rent expenses paid by Cantor Fitzgerald and its subsidiaries. Petitioner immediately lent the $3,107,500 in grant proceeds to Cantor Fitzgerald in exchange for a promissory note that does not mature until November 28, 2056.

*Petitioner's Tax Advice and 2007 Return Positions*

Sometime in 2003 the Cantor Group requested a private letter ruling that, with respect to its anticipated receipt of government funds under one or more grant programs, including but not limited to the JCRP, the funds were excludable from gross income under section 102. The specific terms of the JCRP, including its eligibility requirements, had not been formulated at the time of the request. Jared Rusman, a partner of the Wachtell, Lipton, Rosen, & Katz LLP law firm represented the Cantor Group. Ultimately, the Cantor Group did not pursue a private letter ruling regarding whether World Trade Center grants generally or the JCRP specifically were excludable from gross income as gifts.

Petitioner timely filed Form 1120, U.S. Corporation Income Tax Return. Cantor Fitzgerald's in-house accounting department prepared the return. Because petitioner is a holding company and its only purpose is to facilitate the flow of grant payments by lending the proceeds to Cantor Fitzgerald affiliates, it paid no wages, salaries, employee benefits, or rent in 2007. Petitioner reported $1,278,545 of interest income generated by intercompany loans that involved grant proceeds. It did not report as includible in gross income the $3,107,500 in grant proceeds received, nor did it attach Form 8275, Disclosure Statement, or Form 8275–R, Regulation Disclosure Statement, or otherwise disclose that it had excluded the proceeds from gross income. Petitioner reported $395,439 of income tax.

## OPINION

The Commissioner's determinations in a Notice of Deficiency are generally presumed correct, and the taxpayer bears the burden of proving those determinations are erroneous. Rule 142(a)(1); *Welch v. Helvering*, 290 U.S. 111, 115 (1933).

In cases involving unreported income the Commissioner must establish an evidentiary foundation connecting the taxpayer to the income-producing activity or demonstrate that the taxpayer actually

received income. *Walquist v. Commissioner*, 152 T.C. 61, 67 (2019). "Once the Commissioner makes the required threshold showing, the burden shifts to the taxpayer to prove by a preponderance of the evidence that the Commissioner's determinations are arbitrary or erroneous." *Id.* at 67–68. The parties do not dispute that petitioner received the $3,107,500 of grant proceeds from Empire State. Respondent has met his burden with respect to the unreported income issue, and the burden rests on petitioner to show that respondent's determinations are arbitrary or erroneous. *See id.* Petitioner has not claimed or shown that it meets the requirements of section 7491(a) to shift the burden of proof to respondent as to any relevant factual issue.

In support of its defense to the accuracy-related penalty, petitioner offered as evidence Exhibit 24-P, a purported letter drafted by Attorney Jared Rusman and sent to respondent in which the Cantor Group requested a presubmission conference concerning petitioner's request for a private letter ruling (presubmission memorandum) with respect to the taxability of grant proceeds. At trial respondent objected to the document's admission on the basis of authenticity, relevance, and hearsay. The presubmission memorandum discusses petitioner's legal position with regard to government grant programs relating to the World Trade Center attacks, generally, but the eligibility requirements of the JCRP grant program had yet to be finalized at the time of the request. Because we do not rely on Exhibit 24-P, there is no need to decide whether the Exhibit should be admitted.

I.      *Whether the Grant Proceeds Are Includible in Gross Income*

Section 61(a) defines gross income as "all income from whatever source derived" unless excluded by a specific provision of the Code. Inclusions in gross income under section 61 are construed broadly, whereas exclusions from gross income are construed narrowly. *Commissioner v. Schleier*, 515 U.S. 323, 327–28 (1995); *Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426, 430 (1955).

Petitioner contends that the grant proceeds are not includible in gross income for three reasons: (1) the Supreme Court's holding in *Edwards v. Cuba Railroad Co.*, 268 U.S. 628 (1925), that payments authorized by the Congress of Cuba to a New Jersey corporation are not income, supports its exclusion; (2) no pronouncement from Congress has classified grants under the JCRP as income; and (3) the ARDA does not include anything stated or implied indicating that the grant proceeds were income.

We disagree with petitioner's arguments. The term "gross income" is "read expansively to include all realized gains and forms of enrichment, that is, 'all gains except those specifically exempted.'" *Collins v. Commissioner*, 3 F.3d 625, 630 (2d Cir. 1993) (quoting *Commissioner v. Glenshaw Glass Co.*, 348 U.S. at 430), *aff'g* T.C. Memo. 1992-478. The items listed under section 61(a) are illustrative, not exclusive. Treas. Reg. § 1.61-1(a). Petitioner's reliance on *Cuba Railroad* as "controlling" in this case is misplaced. We have previously observed that the effect of *Cuba Railroad* "has been substantially muted, if not eliminated, by the broad sweep accorded section 61 in [*Glenshaw Glass* and its progeny]." *State Farm Road Corp. v. Commissioner*, 65 T.C. 217, 227 (1975) (citing *Teleserv. Co. of Wyo. Valley v. Commissioner*, 254 F.2d 105, 108 (3d Cir. 1958), *aff'g* 27 T.C. 722 (1957)). Accordingly, the grant proceeds are income under section 61(a) unless there is a specific exclusion which covers the grant proceeds.

Taxpayers bear the burden of showing that an income exclusion "falls squarely within the requirements for the exclusion." *Forste v. Commissioner*, T.C. Memo. 2003-103, slip op. at 17. Since deciding *Cuba Railroad* in 1925, the Supreme Court has issued several decisions in which it has developed its jurisprudence with respect to nonshareholder contributions to capital. *See United States v. Chi., Burlington & Quincy R.R. Co.* (*CB&Q*), 412 U.S. 401 (1973); *Brown Shoe Co. v. Commissioner*, 339 U.S. 583 (1950); *Detroit Edison Co. v. Commissioner*, 319 U.S. 98 (1943); *Tex. & Pac. Ry. Co. v. United States*, 286 U.S. 285 (1932). *CB&Q*, which we discuss in depth below, distinguishes *Cuba Railroad* because it stands for the proposition that government payments made in furtherance of a public benefit are not per se capital contributions, but rather are subject to further inquiry along the guidelines provided therein. A proper reading of *Cuba Railroad* needs to incorporate this contextual framework.

Petitioner contends that the grant proceeds are excludable from gross income under one of three statutory provisions: (1) as a contribution to capital under section 118(a); (2) as a gift under section 102(a); or (3) as a qualified disaster relief payment under section 139(a).

We disagree with petitioner with respect to all three of its arguments and conclude the grant proceeds are included in its income for 2007.[4]

A.    *Nonshareholder Contributions to Capital*

Section 118(a) generally excludes from gross income any contribution to the capital of a corporation. This includes contributions made by nonshareholders. Treas. Reg. § 1.118-1. The exclusion does not apply, however, to any money or other property transferred in consideration for goods or services rendered.[5]  *Id.*  Congress enacted section 118 to codify existing judicial doctrine that treated certain transfers to corporations from nonshareholders as capital contributions rather than as income to the corporation. *Nathel v. Commissioner*, 615 F.3d 83, 89 (2d Cir. 2010)*, aff'g* 131 T.C. 262 (2008).

In *CB&Q* the Supreme Court analyzed the precodification decisions regarding section 118 and found that for a transfer to qualify as a contribution to capital under section 118(a), the transferor must intend it as such. *CB&Q*, 412 U.S. at 411. The Supreme Court identified five possible "characteristics" of a nonshareholder contribution to capital to determine intent when it is not readily apparent from the evidence: (1) the contributed asset(s) become part of the transferees permanent working capital; (2) the contributed asset(s) cannot be compensation for direct, quantifiable services rendered; (3) the contributed asset(s) must be bargained for; (4) the contributed asset(s) must foreseeably result in a benefit to the transferee in an amount commensurate with its value; and (5) the contributed asset(s) will be employed in or contribute to the production of additional income. *Id.* at 413.

The U.S. Court of Appeals for the Third Circuit thoroughly reviewed caselaw regarding the application of section 118 in *Commissioner v. BrokerTec Holdings, Inc.*, 967 F.3d 317 (3d Cir. 2020), *rev'g* T.C. Memo 2019-32.  That case dealt with a similar section 118

---

[4] In its Petition, petitioner argued that even if the grant proceeds were found to be includible in gross income, they did not constitute income until the end of the recapture period under the ARDA. Petition 6. However, petitioner did not pursue this argument on brief. We conclude that petitioner has conceded this contention. *See* Rule 151(e)(4) and (5); *Petzoldt v. Commissioner*, 92 T.C. 661, 683 (1989); *Money v. Commissioner*, 89 T.C. 46, 48 (1987).

[5] In 2017 Congress amended section 118 to exclude "any contribution by any governmental entity or civic group (other than a contribution made by a shareholder as such)" from the meaning of a contribution to the capital of a taxpayer. Tax Cuts and Jobs Act of 2017, Pub. L. No. 115-97, § 13312(a)(3), 131 Stat. 2054, 2132.

dispute involving a New Jersey grant program established in the aftermath of the World Trade Center attacks. The Third Circuit found that the grantor did not intend that the grant proceeds be a contribution to capital because "even a relocation inducement 'must become a permanent part of the transferee's working capital structure.'" *Commissioner v. BrokerTec Holdings, Inc.*, 967 F.3d at 323 (quoting *CB&Q*, 412 U.S. at 413). The taxpayer in *BrokerTec Holdings, Inc.*, could not show that the proceeds became a permanent part of its working capital because the grant proceeds were not explicitly restricted for use in the acquisition of capital assets. Other courts have adopted similar interpretations. *See, e.g., AT&T, Inc. v. United States*, 629 F.3d 505, 517 (5th Cir. 2011) (describing the *CB&Q* factors as "mandatory characteristics" and requiring that the property transferred become part of the permanent working capital); *Springfield St. Ry. Co. v. United States*, 577 F.2d 700, 702–03 (Ct. Cl. 1978).

We agree with the Third Circuit's summary of relevant caselaw and will focus only on key points. Taking into consideration *Cuba Railroad* and *Texas & Pacific Railway Co.*, the Third Circuit concluded that unrestricted government payments and payments based on a company's income, rather than the amount of capital investment made by the company, indicate an intent to provide income. *Commissioner v. BrokerTec Holdings, Inc.*, 967 F.3d at 324. In *Detroit Edison Co. v. Commissioner*, 319 U.S. at 99, the Supreme Court considered whether customers' payments to the taxpayer to build infrastructure necessary to provide electricity to the customers were contributions to capital or compensation for services rendered. The Supreme Court concluded that the customers' payments were income because they went to the cost of services rendered and were "add[ed] to the [c]ompany's surplus." *Id.* at 103; *see also Commissioner v. BrokerTec Holdings, Inc.*, 967 F.3d at 324.

Following the decision in *Detroit Edison Co.*, the Third Circuit considered whether the transfer of a deed of a factory to a corporation was a capital contribution. *Commissioner v. McKay Prods. Corp.*, 178 F.2d 639 (3d Cir. 1949), *rev'g* 9 T.C. 1082 (1947); *see also Commissioner v. BrokerTec Holdings, Inc.*, 967 F.3d at 324. In *Commissioner v. McKay Products Corp.*, 178 F.2d at 643, the Third Circuit concluded the deed to the factory was a contribution to capital and different from payments that were related to a service because the factory was not contributed as direct compensation for any service but was "being used by the taxpayer in the operation of its business." *See also Commissioner v. BrokerTec Holdings, Inc.*, 967 F.3d at 324–25.

Within a year of the Third Circuit's decision in *McKay Products Corp.*, the Supreme Court considered in *Brown Shoe Co. v. Commissioner*, 339 U.S. 583, whether land and cash provided by community groups for the production or enlargement of a factory were contributions to capital. The Supreme Court in *Brown Shoe Co.* compared the land and cash to the deed in *McKay Products Corp.* and distinguished it from the payments in *Detroit Edison Co.*, and it concluded the land and cash transfers constituted capital because "[t]he contributions [in *Brown Shoe Co.*] were provided by citizens . . . who neither sought nor could have anticipated any direct service or recompense whatever, their only expectation being that such contributions might prove advantageous to the community at large." *Brown Shoe Co. v. Commissioner*, 339 U.S. at 591. The Supreme Court found such transfers "manifested a definite purpose to enlarge the working capital of the company." *Id.*

The taxpayer in *BrokerTec Holdings, Inc.*, argued that *McKay Products Corp.* and *Brown Shoe Co.* support its position that grants were contributions to its capital because the grants were relocation inducements. The Third Circuit rejected this argument and concluded that *Cuba Railroad*, *Texas & Pacific Railway Co.*, *McKay Products Corp.*, and *Brown Shoe Co.* support the position that unrestricted cash grants based on the recipient's income are not contributions to capital but are rather supplements to income. *Commissioner v. BrokerTec Holdings, Inc.*, 967 F.3d at 325. Specifically, the Third Circuit found instructive that the New Jersey grant program "placed no restriction on how the . . . grants could be used: they could be used to make capital improvements, but they could also be used for operational expenses such as paying wages, or even paying dividends to shareholders." *Id.* at 326. Further, the funds received by the taxpayer in *BrokerTec Holdings, Inc.*, were not based on the amount of capital improvements made by the taxpayer. *Id.*

Petitioner contends that the facts of this case differ from those of *BrokerTec Holdings, Inc.*, and that the Third Circuit's opinion does not preclude the JCRP grant from being a nontaxable contribution. Petitioner's position relies upon two grounds. First, *Commissioner v. BrokerTec Holdings, Inc.*, 967 F.3d at 318, relies on the fact that the New Jersey grant program did not restrict how the taxpayer could use the cash, and the ARDA restricted the types of expenses the grant proceeds could be used for. Second, the New Jersey grants were based on income tax revenue that the new jobs would generate. *Id.* Regarding the generation of revenue, petitioner contends that for the New Jersey

grant program the grants were not paid until the state confirmed the amount of income tax expected to be withheld from wages. The JCRP had no such requirement.

In contrast respondent contends that *BrokerTec Holdings, Inc.*, supports his position that the grant proceeds are not excluded from gross income. The Third Circuit concluded that a relocation inducement provided by the state, to be considered a nonshareholder capital contribution under section 118, "must become a permanent part of the transferee's working capital structure." *Commissioner v. BrokerTec Holdings, Inc.*, 967 F.3d at 323 (quoting *CB&Q*, 412 U.S. at 413). The Third Circuit concluded that there was no intent that the cash grants become a permanent part of the taxpayer's working capital structure. *Id.* Respondent similarly contends here that Empire State did not intend the grant proceeds become a permanent part of petitioner's working capital structure.

We agree with respondent's contention that, according to *CB&Q*, section 118(a) applies only where a transferor intends to make a contribution to the permanent working capital of the taxpayer. *See also* I.R.S. Notice 2003-18, 2003-1 C.B. 699.[6] Evidence of a transferor's intent includes any conditions attached to a transfer, particularly whether funds "might be used for the payment of dividends, of operating expenses, of capital charges, or for any other purpose within the corporate authority, just as any other operating revenue might be applied." *Tex. & Pac. Ry. Co.*, 286 U.S. at 290.

Even though we agree with petitioner that there are some differences, we do not believe that the difference in facts should result in a conclusion different from that in *BrokerTec Holdings, Inc.* In *BrokerTec Holdings, Inc.*, and in this case, the grant amount was not linked to capital improvements nor restricted for use for the acquisition of capital assets.

Capital assets are assets which provide economic benefit to the taxpayer beyond the year in which the expenditure for them is incurred. *Compare* § 162 (providing a deduction for ordinary and necessary business expenses incurred within a taxable year), *with* § 263 (prohibiting a deduction for capital expenditures made within the taxable year). *See generally INDOPCO, Inc. v. Commissioner*, 503 U.S.

---

[6] Respondent did not rely on Notice 2003-18 in making his determination with respect to the tax liability at issue.

79, 87 (1992) ("Although the mere presence of an incidental future benefit . . . may not warrant capitalization, a taxpayer's realization of benefits beyond the year in which the expenditure is incurred is undeniably important in determining whether the appropriate tax treatment is immediate deduction or capitalization.").

Under the JCRP, a grantee could request payment of, or reimbursement for, eligible expenses in five categories, all directly tied to employment: (1) wages, (2) payroll taxes, (3) employee benefits, (4) rent, and (5) movable equipment and furniture. The first four of these items are currently deductible operating expenses, meaning a taxpayer can deduct the costs against gross income for the year in which the expense is paid or incurred; only one—movable equipment and furniture—is a capital expenditure requiring such costs to be capitalized and recovered over time.

Like the taxpayer in *BrokerTec Holdings, Inc.*, petitioner received cash grants for creating jobs after the World Trade Center terrorist attacks. The disbursement at issue here was an additional disbursement under the ARDA and calculated with respect to Cantor Fitzgerald's aggregate job growth, or number of full-time employment positions that Cantor Fitzgerald created and retained in excess of the "minimum employment number" specified in the ARDA for each particular geographic location when it requested disbursement. Because the grant proceeds at issue were intended to reimburse petitioner for eligible expenses it had already incurred, the proceeds assimilated into petitioner's cash accounts upon receipt and could be used at petitioner's discretion.

Empire State lacked the requisite intent to make a capital contribution. First, Empire State's intent in providing the grant proceeds at issue was to reimburse petitioner for rent expenses. For this reason alone, the grant proceeds were not intended to become a permanent part of the petitioner's working capital structure. *See CB&Q*, 412 U.S. at 413; *see also Springfield St. Ry. Co.*, 577 F.2d at 701 (holding that government subsidies were income where the taxpayer "pointed to no law or regulation that prevented the recipient of a grant from using it for wages and salaries, maintenance, insurance, administrative overhead, or other noncapital expenditure").

At trial petitioner introduced evidence that it claims demonstrates that Cantor Group entities other than petitioner spent certain amounts on movable furniture and equipment in the year

following the $3,107,500 grant distribution. Even if we construe this evidence in the light most favorable to petitioner, the payment requisition form petitioner submitted to Empire State unequivocally requested reimbursement for rent expenses. We cannot rewrite the terms and conditions of an arm's-length agreement simply because petitioner in retrospect wishes a different tax result. *See Erickson v. Commissioner*, 56 T.C. 1112, 1123 (1971).

On the same day petitioner received the grant proceeds, it lent the entire amount to its sole shareholder in exchange for a 49-year promissory note. Such a long-term note receivable, maturing in 49 years, is generally not considered part of a company's working capital structure. *See Commissioner v. BrokerTec Holdings, Inc.*, 967 F.3d at 326 ("[*United States v. Coastal Utilities, Inc.*, 483 F. Supp. 2d 1232 (S.D. Ga. 2007), *aff'd per curiam*, 514 F.3d 1184 (11th Cir. 2008), and *AT&T*, 629 F.3d 505,] illustrate that, for government payments to 'become a permanent part of the transferee's working capital structure,' as required by *CB&Q*, 412 U.S. at 413 . . . , they must in some way be designated for use as capital—whether by an explicit restriction on the use of the funds, or by tying the amount of funds to the amount of a capital investment required of the company. Otherwise, the government payments are merely intended as supplements to income."). Because the grant proceeds at issue were transferred as reimbursement for rent and did not become a part of petitioner's permanent working capital structure, we find the transfer was intended to supplement petitioner's income and defray current operating costs rather than fortify its permanent working capital. *See CB&Q*, 412 U.S. at 413. In cases where other evidence provides clearer guidance concerning the contributor's motivation, a detailed holding as to each of the *CB&Q* characteristics is superfluous. *See Coastal Utils., Inc.*, 483 F. Supp. 2d at 1250.

Petitioner relies upon section 362(c) to support its position that the grant proceeds are a nonshareholder contribution to capital. Petitioner contends that the grant proceeds are a nonshareholder contribution to capital because the Code provides for correlative basis adjustments for property acquired with money received as a capital contribution from a nonshareholder. *See* § 362(c)(2).

Section 362 deals only with the basis of certain property to a corporation. The basis adjustment under section 362(c) has no bearing on whether the disbursement of grant proceeds by Empire State to petitioner qualified as a nonshareholder contribution to capital under section 118(a). To the contrary, Congress implied that money

contributed to a corporation by a nonshareholder and used for operating expenses, such as rent, would not qualify as a section 118 contribution to capital by continuing to allow deductions for such expenses under section 162. *See* § 162(a); *United States v. Skelly Oil Co.*, 394 U.S. 678, 685 (1969) (stating that taxpayers are not to be accorded an unfair tax windfall). Petitioner's argument asks us to allow an unfair tax windfall to the Cantor Group—a deduction to the entities that paid the rent and an income exclusion of the grant proceeds that reimbursed petitioner for those expenses.

Accordingly, the grant proceeds are not eligible for exclusion under section 118(a).

B. *Gifts*

Section 102(a) provides that gross income does not include the value of property acquired by gift. Whether a transfer is a gift for tax purposes is determined by the transferor's intent. *Commissioner v. Duberstein*, 363 U.S. 278, 285–86 (1960). A gift must proceed from a detached and disinterested generosity, motivated by affection, respect, admiration, charity, or the like. *Id.*

Petitioner argues that the grant proceeds were a gift from the government. We disagree. First, the evidence establishes that Empire State's motive for providing the grant proceeds was not detached and disinterested generosity but instead the pursuit of commitments of increased employees by petitioner. Steven Gold, who served as vice president of industry development for Empire State, testified that the program's "primary goal" was to obtain long-term commitments from companies, and its "whole success" turned on how many jobs were created and maintained. To be eligible for a JCRP grant, companies were required to locate in lower Manhattan for at least seven years and meet certain employment goals, including a minimum commitment to provide at least 200 full-time jobs.

Before receiving a grant disbursement, petitioner was required to submit a "Report of Employment" Form demonstrating compliance with the agreed-to employment goals. Mr. Gold testified that Empire State's role in the program was "just like a salesperson['s]," requiring it to negotiate with companies over job commitments. Mr. Gold characterized the JCRP grants as "incentive[s] to get something back for New York state." Rather than issuing the grants out of detached and disinterested generosity, Empire State anticipated an economic benefit

for the government when administering the grant program. The estimates of Cantor Fitzgerald's annual fiscal impact on tax revenues for New York City and the State of New York—$9.8 million and $10.5 million, respectively—illustrate the tangible benefit the government anticipated in establishing the grant program.

Second, our review of the funding legislation and associated legislative history persuades us that Congress did not possess the requisite donative intent for us to consider the grant proceeds a gift. The acts that appropriated community development block grants to the State of New York for the JCRP refer to the economic revitalization of New York City as among the purposes for the funds. *See* 2001 Emergency Supplemental Appropriations Act for Recovery from and Response to Terrorist Attacks on the United States, Pub. L. No. 107-38, 115 Stat. 220, 220 (allocating funds for, among other purposes, "repairing public facilities and transportation systems damaged by the attacks"); Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 2002, Pub. L. No. 107-73, § 434, 115 Stat. 651, 699 (2001) ("*Provided*, That such funds may be awarded to the State of New York for assistance for properties and businesses damaged by, and for economic revitalization related to, the September 11, 2001 terrorist attacks on New York City, for the affected area of New York City . . . ."); Department of Defense and Emergency Supplemental Appropriations for Recovery from and Response to Terrorist Attacks on the United States Act, 2002, Pub. L. No. 107-117, 115 Stat. 2230, 2336 (including multiple references to funds being made available to individuals, nonprofits, or small businesses within a specified geographical area which experienced economic loss); 2002 Supplemental Appropriations Act for Further Recovery From and Response To Terrorist Attacks on the United States, Pub. L. No. 107-206, 116 Stat. 820, 889 ("*Provided further*, That such funds may be used for assistance for properties and businesses (including the restoration of utility infrastructure) damaged by, and for economic revitalization directly related to, the terrorist attacks on the United States that occurred on September 11, 2001, in New York City . . . .").

The legislative history acknowledges "the tremendous human losses suffered by those businesses located in the World Trade Center, particularly those firms which suffered the greatest loss of life in the attacks" and states that the appropriated funds are meant "to support the redevelopment of the areas of New York City affected by the attacks and to encourage those businesses most devastated by the attacks to

remain in New York City." H.R. Rep. No. 107-593, at 180 (2002) (Conf. Rep.), *reprinted in* 2002 U.S.C.C.A.N. 544, 613. While the grant programs, as a response to the tragedy, possessed some element of charity, the principal terms of the JCRP which were embodied in the ARDA, as well as congressional intent of the acts which provide the funding, make clear that the main objective of the JCRP was economic revitalization of the areas affected by the attacks.

We conclude that Congress appropriated the funds primarily out of (1) a provision of governmental aid to firms like Cantor Fitzgerald that were devastated by the World Trade Center attacks and (2) the anticipation of economic benefits that would result from the economic revitalization of New York City. Such transfers are not considered gifts under the Code. *See Commissioner v. Duberstein*, 363 U.S. at 285.

### C.    *Qualified Disaster Relief Payments*

Section 139(a) provides that gross income does not include any amount received by an individual as a qualified disaster relief payment. Petitioner concedes that the grant proceeds at issue were not paid to an individual but contends that section 139(a) applies to corporations.

The starting point for determining the scope of a statute is its text. *See Ross v. Blake*, 578 U.S. 632, 638 (2016). When a statute's text is unambiguous, our sole function is to enforce the terms as written. *See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000). The text of section 139 is unambiguous in its application solely to individuals. Petitioner has offered no support for concluding that Congress intended section 139(a) to extend beyond its plain meaning to exclude qualified disaster relief payments from a corporation's income. Therefore, the grant proceeds are not qualified disaster relief payments pursuant to section 139.

### II.    *Petitioner's Liability for an Accuracy-Related Penalty*

Section 6662(a) imposes a 20% accuracy-related penalty on any portion of an underpayment of tax required to be shown on a return if, as provided by section 6662(b)(2) the underpayment is attributable to a "substantial understatement of income tax."[7]    A substantial

---

[7] Respondent initially determined a section 6662(a) accuracy-related penalty on account of petitioner's negligence or disregard of rules or regulations pursuant to section 6662(b)(1) as well as for a substantial understatement of income tax pursuant

understatement of income tax exists for a corporation if there is an understatement of tax for a year that exceeds the lesser of (i) 10 percent of the tax required to be shown on the return for the year (or, if greater, $10,000) or (ii) $10 million. § 6662(d)(1)(B). The requirements of a substantial understatement have been met.

While the burden of production with respect to the imposition of penalties under section 6662 generally lies with the Commissioner, *see* § 7491(c), such is not the case when the Notice of Deficiency determines a penalty against a corporation. *Dynamo Holdings Ltd. P'ship. v. Commissioner*, 150 T.C. 224, 231–32 (2018) (citing *NT, Inc. v. Commissioner*, 126 T.C. 191 (2006)).[8]

The penalty does not apply to any portion of an understatement attributable to a taxpayer's tax treatment of an item "if there is or was substantial authority for such treatment" or there is a reasonable basis for the taxpayer's treatment of the item and the facts relevant to the tax treatment of the item are adequately disclosed on the return or an attached statement. § 6662(d)(2)(B). In evaluating whether a taxpayer's position regarding the treatment of a particular item is supported by substantial authority, the weight of authorities in support of the taxpayer's position must be substantial in relation to the weight of the authorities supporting contrary positions. Treas. Reg. § 1.6662-4(d)(3)(i). Authority, for purposes of determining whether there is substantial authority for a taxpayer's treatment of an item, includes the Code, the regulations, caselaw, and certain IRS administrative pronouncements. *Id.* subdiv. (iii).

We conclude that there was substantial authority for petitioner's treatment of the grant proceeds. The JCRP was created to address an unimaginable terrorist attack. Petitioner excluded the grant proceeds under its reasonable application of at least three decisions of the Supreme Court, including *Cuba Railroad*, *Brown Shoe Co.*, and *CB&Q*; the statutory text of section 118 as it existed at the time; and the regulations thereunder. The prevailing Code section has been amended since the year at issue to clarify that certain contributions made by

---

to section 6662(b)(2). Respondent concedes that petitioner is not liable for the penalty for 2007 on grounds of negligence or disregard of rules or regulations but maintains his position with respect to the penalty for a substantial understatement of tax.

[8] Petitioner has not raised as an affirmative defense whether respondent complied with section 6751(b). We conclude that petitioner has waived this defense. *See Dynamo Holdings Ltd. P'ship.*, 150 T.C. at 237.

governmental entities are not treated as contributions to capital. *See* Tax Cuts and Jobs Act of 2017, § 13312(a)(3), 131 Stat. at 2132. Accordingly, petitioner is not liable for the section 6662(a) penalty.

III.  *Conclusion*

Petitioner has not established that the grant proceeds received under the JCRP are excluded from gross income under any statutory provision and are therefore includible in gross income for 2007 under section 61.  We conclude that petitioner had substantial authority supporting its position that the grant proceeds could have been excluded from income due to the reasons the grant was created.

We have considered the arguments made by the parties and, to the extent they are not addressed herein, we find them to be moot, irrelevant, or without merit.

To reflect the foregoing,

*Decision will be entered for respondent as to the deficiency and for petitioner as to the penalty pursuant to section 6662.*

Reviewed by the Court.

FOLEY, BUCH, NEGA, PUGH, ASHFORD, URDA, COPELAND, JONES, TORO, GREAVES, MARSHALL, WEILER, WAY, LANDY, ARBEIT, GUIDER, JENKINS, and FUNG, *JJ*., agree with this opinion of the Court.